# In the United States Court of Federal Claims

### Nos. 16-200T; 16-201T; 16-210T
### Filed: January 14, 2020

| | |
|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* |
| **JON A. ROCHLIS, ANNE R. LAVIN,** | \* |
| **JON ROCHLIS AS EXECUTOR OF** | \* **Trial; Tax; Federal Tax** |
| **THE ESTATE OF IRENE M. ROCHLIS** | \* **Deductions; Theft Loss; 165** |
| **(AKA WARREN),** | \* **U.S.C. § 165; Treas. Reg. 1.165;** |
| **KENNETH ISHII, and SHERYL A.** | \* **State law; Constructive Sale.** |
| **ISHII,** | \* |
| | \* |
| **Plaintiffs,** | \* |
| **v.** | \* |
| | \* |
| **UNITED STATES,** | \* |
| | \* |
| **Defendant.** | \* |
| | \* |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* | |

**Brian G. Isaacson**, Isaacson Law Firm, Seattle, WA for plaintiffs.

**Benjamin C. King, Jr.**, Trial Attorney, Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., for the defendant. With him were **Mary M. Abate**, Assistant Chief, Court of Federal Claims Section, **David I. Pincus**, Chief, Court of Federal Claims Section, and **Richard E. Zuckerman**, Principal Deputy Assistant Attorney General, Tax Division, United States Department of Justice.

## O P I N I O N

<u>**HORN, J.**</u>

The plaintiffs, Jon A. Rochlis, Anne R. LaVin, Jon Rochlis as Executor of the Estate of Irene M. Rochlis (aka Warren), Kenneth Ishii, and Sheryl A. Ishii, filed complaints in the United States Court of Federal Claims, seeking a tax refund from an alleged theft loss in 2009 as a result of the purported investments by Derivium Capital, LLC (Derivium). After all plaintiffs filed claims for refund with the Internal Revenue Service (IRS) in 2013 for the tax year 2009, all plaintiffs subsequently filed complaints in each of the above captioned cases. The complaints and amended complaints in Case Nos. 16-200T, 16-201T, and 16-210T are substantially similar except for the amounts plaintiffs allege they lost due to the theft at issue and the amount they seek to recover.[1] A three day trial was held and

---

[1] The court refers to Jon A. Rochlis, Anne R. LaVin, Jon Rochlis as Executor of the Estate of Irene M. Rochlis (aka Warren), Kenneth Ishii and Sheryl A. Ishii together as the plaintiffs. All the plaintiffs were represented by the same counsel of record, Mr. Isaacson, and the cases all were tried simultaneously. When addressing an individual plaintiff, this

post-trial briefings on the legal and factual issues raised in these cases were filed by all parties. After review of the transcripts, the testimony, the exhibits entered into the record and the submissions subsequently filed by the parties, the court makes the following findings of fact.

**FINDINGS OF FACT**

Derivium Capital

The parties stipulate[2] that Charles Cathcart, "a Ph.D. economist, developed the concept for a 90% stock loan program in 1997, and in the same year began promoting a variety of 90% Loan products through FSC First Security Capital (Texas), which he co-owned with several individuals, including Kenneth Calvert, David Kekich, Rob Rawlings, and Clifford Lloyd." (internal references omitted). The joint stipulations provide that "[i]n 1998, [Charles] Cathcart relocated the 90% Loan Program to Charleston, South Carolina in order to exercise more control over it. In Charleston, [Charles] Cathcart formed First Security Capital, LLC ('FSC'), and thereafter FSC Texas ceased operations." According to the joint stipulations, Charles Cathcart held a 50% ownership interest in FSC and he served as President. The joint stipulations indicate that "[e]ffective January 1, 2000, FSC's name was changed to Derivium Capital, LLC," and "Derivium eventually bought out Lloyd, Calvert, Rawlings and Kekich's interests. By 1998, ownership of FSC was allocated as follows: [Charles] Cathcart 50%, [Yurij] Debevc 25% and Scott [Cathcart] 25%."[3]

---

Opinion identifies the plaintiff by individual name. The court notes, however, that Irene M. Warren is identified in a number of different ways in the filings and the documents in Case No. 16-201T. The complaint and amended complaint in Case No. 16-201T identified the plaintiff as "Irene M. Rochlis (aka Warren)," and the second amended complaint identified the plaintiff as "Jon Rochlis as Executor of the Estate of Irene M. Rochlis (aka Warren)." Other filings in Case No. 16-201T identify the plaintiff as as the "Estate of Irene M. Rochlis," still others as "Irene Rochlis." The court notes that the Master Loan Agreement, discussed below, was signed by "Irene M. Warren," therefore, when referring to actions taken by the plaintiff in Case No. 16-201T regarding the Derivium transaction, the court refers to the plaintiff as "Irene M. Warren."

[2] The joint stipulations in the above captioned cases come not only from agreement by the named parties for these cases, but also are stipulations to facts that were previously stipulated to by Charles Cathcart and the United States Department of Justice in United States of America v. Charles Cathcart, et al., N.D. Cal., Case No: C-07-4762 (filed Nov. 19, 2009), and which the parties also agreed to stipulate in these cases. The preamble to the joint stipulations in the above captioned cases states: "The parties to the above-entitled action, having met and conferred, and upon determining that good cause exists, hereby stipulate to those facts that were stipulated by Charles Cathcart and the Department of Justice in *United States of America v. Charles Cathcart, et al* [sic]*, N.D. Cal.,* Case No: C-07-4762 PJH, document 398, filed 11/19/09." (emphasis in original).

[3] Debevc refers to Yurij Debevc, Charles Cathcart's former business associate who Charles Cathcart brought "into the business to oversee operations," and Scott refers to

"Throughout its operation, virtually all of Derivium's business consisted of the marketing and administration of the 90% Loan Program."

The joint stipulations make clear that

[t]he 90% Loan Program was marketed as a way for customers to: (a) obtain the benefit of cash in an amount equal to 90% of the value of their securities; (b) defer paying capital gains on the transaction; and (c) be protected against the risk that the securities would depreciate while at the same time preserving their ability to take advantage of any possible appreciation in the securities' value.

The parties also stipulate that

Derivium's marketing materials emphasized the customer's ability to recover their securities at the end of the transaction term, stating that the customer would "retain beneficial ownership" of his securities, such that "if your equities increase in value, you keep all the upside," and "[b]ecause you still own your stocks, you retain all the potential for further gains." These statements were false, since Derivium sold its customers' securities prior to the inception of the transaction.

(alternation in original). The joint stipulations indicate that "[u]pon Derivium's receipt of the securities, in every case, the securities were immediately sold." The parties also stipulate that:

The marketing materials state that Cathcart[4] is a "world-recognized expert in building and preserving wealth for clients through the application of sophisticated hedging strategies," whose "proprietary structures and models are the foundation of the products offered through Derivium Capital." Derivium's marketing materials also state that Derivium will engage in "hedging" transactions to protect the value of customers' securities. These statements were also false. Derivium never engaged in hedging transactions. Rather, it simply sold its customers securities, remitted an amount equal to 90% of the proceeds back to its customers, and kept the remaining 10% for its own purposes, including paying operating expenses and fees to its owners.

The joint stipulations of fact point to an obvious untruth. According to the parties' joint stipulation of facts:

---

Charles Cathcart's son, Scott Cathcart, who, according to the joint stipulations, "spearhead[ed]" the marketing of the 90% Loan Program."

[4] The court notes that the joint stipulations, the parties' submissions, and the trial transcript refer to Charles Cathcart generically as "Cathcart."

Following the sale of a customer's securities, however, Derivium and the supposed lenders faced a countervailing risk, which was that stock values would rise. Because customers' securities were immediately sold in every case, if a customer elected under the MLA[5] to recover his securities at the end of the transaction term, Derivium had to repurchase the securities on the open market to return those shares to the customer.

The parties' joint stipulation of facts also indicate that "[i]n the event that prices for more than a few of the securities submitted as collateral increased substantially during the transaction term, Derivium faced an inherent risk of being unable to satisfy the obligations to customers. Despite this known risk, Derivium never engaged in hedging transactions."

In total, "[t]he 90% Loan Program generated approximately 3100 transactions, totaling more than $1 billion in sale proceeds, 90% of which was used to fund the purported loans to customers, leaving at least $100 million as the difference between the purported loan proceeds and the value of the securities (the 'Net Proceeds')." The joint stipulations continue: "Derivium used the Net Proceeds for a variety of purposes. First, Derivium (and later Derivium Capital USA and Veridia) kept approximately 20 to 25% of the Net Proceeds for itself in the form of commissions. Throughout its operation, Derivium's only significant source of income was commissions from the sale of customer's securities." The stipulations provide that "[t]he bulk of the Net Proceeds (approximately $45 million) was used to fund various start-up companies owned indirectly by [Charles] Cathcart, [Yurij] Debevc and Scott [Cathcart] and located in Orangeburg and Summerville, South Carolina (the 'Start-Up Companies')." According to the joint stipulations: "The purported 'hedging' model implemented by Cathcart involved the immediate sale of the customer's securities and investment of the Net Proceeds into Start-Up companies owned and controlled by the Principals," and "[i]n fact, the provision of funds to the Start-Up Companies did not constitute a genuine hedge, but rather was nothing more than a speculative gamble." "To adequately and truly hedge Derivium's risks related to the 90% Loan Program, Derivium would have had to purchase call options correlated with its customers' securities. In fact, the Net Proceeds from the 90% Loan Program would have been insufficient to purchase adequate call options," and moreover, "Derivium did not maintain reserves of capital that could be drawn upon if the supposed 'hedges' failed."

As early as 2001, Derivium began defaulting on its obligations to its clients when the first transactions engaged in by Derivium in 1998 began maturing. According to the parties' joint stipulations, "Derivium defaulted because Derivium had no genuine hedges in place, had no reserves, and the proceeds from new 90% Loan transactions were

---

[5] Although not defined in the parties' joint stipulation of facts developed for the above captioned cases, the first joint stipulation of facts incorporating the facts that were stipulated by Charles Cathcart and the United States Department of Justice in United States of America v. Charles Cathcart, et al., define MLA as a "Master Agreement to Provide Financing and Custodial Services." See United States of Am. v. Cathcart et. al, No. C 07–4762 PJH.

insufficient to allow Derivium to purchase the replacement securities on the open market for those customers who did seek a return of their highly appreciated stocks." "At the end of 2002, Cathcart ceased marketing and administering securities transactions through Derivium due to litigation by customers whose securities Derivium had failed to return at maturity and due to an investigation by the California Department of Corporations." "Derivium's operations were then assumed and divided among two new entities. Derivium USA, which is wholly-owned by Cathcart, assumed all marketing and sales functions for the 90% Loan Program. Veridia Solutions, LLC which is wholly-owned by Debevc, performed the related administrative functions."[6]

The joint stipulations indicate that "[o]ver the next few years, Derivium racked up tens of millions of dollars in judgments from defaults – yet Cathcart and his co-promoters continued to market and administer the 90% Loan Program."[7] Also according to the joint stipulations, "[b]y 2008, Derivium's failure to perform on its obligations resulted in claims against Derivium totaling approximately $150 million."

The parties in the above captioned cases stipulate that "the claim that the 90% Loan Program involved 'hedging' is false or fraudulent. No funds were used to hedge any 90% Loan transactions. Cathcart's claim that the use of the 90% Loan proceeds . . . constituted hedges against securities was pure fiction and constituted nothing more than an economic gamble." The joint stipulations continue:

> The claim that 90% Loan transactions are non-taxable loans is a false statement. Derivium and/or the purported lender immediately sold the customers' securities at the inception of the transaction – and thus representations that the securities would be "held" as "collateral" were false or fraudulent. Because no genuine "lending" occurred, Cathcart's and Derivium's claims that a foreign "lender" existed were false or fraudulent.

(internal references omitted).

As the United States Tax Court in <u>Raifman v. Commissioner</u> noted, the Derivium program was tailored toward individuals

> who held concentrated positions in a single marketable stock and wished to generate liquidity without triggering a taxable event. The Derivium program facilitated this monetization of stock by "lending" program participants up to

---

[6] The joint stipulations note that, for the purposes of the joint stipulations in the above captioned cases, "Derivium, Derivium USA, and Veridia are collectively referred to as 'Derivium' unless otherwise noted." This Opinion likewise generically refers to Derivium.

[7] The joint stipulations provide that "[b]y 2003, the remaining available funds from new 90% Loan transactions were used to pay commissions to Derivium and its successor entities and to keep the lights on in the Charleston office," and that "[o]ver time the liabilities of the 90% Loan Program increased dramatically."

90% of their stock's fair market value. In return participants would surrender to Derivium the ostensibly leveraged stock as "collateral" and would accrue interest on the loan principal over the life of the loan. Participants were prohibited from making any payments before loan maturity and, similarly, Derivium was prohibited from calling the loan before maturity. Most importantly, the loans were nonrecourse to the participant. Because a Derivium loan was nonrecourse, a participant had no personal liability for principal or interest and could instead choose--for example, should the value of the participant's stock drop over the agreement's term--to default and cede the collateral to Derivium. Alternatively, upon maturity of the loan, participants could pay their balance due and request return of their collateral, or renew and refinance the loan for an additional term in order to monetize any appreciation of the collateral that occurred during the initial loan term.

Raifman v. Comm'r, T.C.M. 2018-101, 2018 WL 3268723, at *12-13 (July 3, 2018) (footnote omitted).[8]

Regarding Charles Cathcart, the joint stipulations provide: "Charles Cathcart, as founder, owner, President, and marketer of the program, participated directly in its organization and sale. Cathcart has been involved in 'the 90% Loan Program from the beginning' and 'designed it.'" The joint stipulations also state that

Cathcart made and caused to be made several false or fraudulent statements with respect to the tax benefits of the 90% Loan Program. Cathcart oversaw and actively participated in Derivium's marketing efforts. As "president of Derivium Capital, LLC," he "had overall responsibility for the management of its role in the transaction which was the marketing and sales and the loan administration." Thus, among other things, Cathcart participated in the training of Derivium's sales staff and edited and approved marketing materials and tax memos that were distributed to clients.

---

[8] The court notes that the plaintiffs in Raifman v. Commissioner, Gregory Raifman and Susan Raifman, are the same plaintiffs as in the previously filed case of Raifman v. Wells Fargo Advisors, LLC, Case No. C 11-02885 SBA, 2014 WL 12013436 (N.D. Calif. March 31, 2014). As explained by the United States Tax Court in Raifman v. Commissioner:

Following the complete collapse of Derivium and all associated entities, the Raifmans, joined by a number of other former Derivium participants, attempted to sue Wachovia for its role in facilitating the transfer of participants' shares to Derivium. On March 31, 2014, the U.S. District Court for the Northern District of California dismissed the participants' claims. In May of 2016, the Court of Appeals for the Ninth Circuit affirmed the judgment of the District Court.

Raifman v. Comm'r, 2018 WL 3268723, at *10.

The joint stipulations further indicate that "[f]or over a decade, Cathcart presided over a scheme marketed in significant part for its purported tax benefits. During this period, Cathcart edited and even authored tax memos that falsely touted the scheme's tax benefits – even after he was advised by a law firm that the 90% Loan Program likely violates the tax laws."

The parties before this court stipulate that:

Cathcart knew that the 90% Loan scheme operated by selling the customers' securities immediately upon receipt ("on behalf of" sham "lenders" Cathcart created), retaining 10% of the proceeds as income in Derivium-controlled bank and brokerage accounts, and then distributing the proceeds to Cathcart and his associates directly and to the Start-Up Companies (which Cathcart and his associates owned and manage).

The parties' joint stipulations also indicate that "Cathcart had actual knowledge that the customers' securities were not 'held' but were rather sold immediately," and "Cathcart also knew or had reason to know that no 'hedging' took place and that the 90% Loan transactions were taxable sales. Cathcart is a Ph.D. economist who spent years working on actual derivatives and hedging instruments before creating the 90% Loan Program." Moreover, "[b]ased on the absence of actual hedging, Cathcart had reason to know Derivium would lack the funds to perform on (and thus would default on) its obligation to return customers' securities upon demand at maturity." The parties further stipulate that:

Cathcart has taken repeated steps to obfuscate the true nature of and his role in certain aspects of the scheme. He has falsified or caused to be falsified documents from the purported lenders, created artificial foreign entities to act as "lenders" and as the "owners" of the scheme's proceeds, and continues to deny any involvement in the "foreign lenders" participation in the scheme.

The parties stipulate that "Cathcart knew or had reason to know that the 90% Loan Program's claims were false or fraudulent under Section 6700 [26 U.S.C. § 6700]." In addition, the parties' joint stipulations indicate that: "As the scheme's founder, creator, and President, and as the alter ego of all of the sham 'foreign lenders,' Cathcart *knew* that several of the scheme's claims were false or fraudulent." (emphasis in original). As the United States Tax Court in Raifman noted, "[o]n March 5, 2010, Mr. Cathcart, the principal of the Derivium program, was permanently enjoined from promoting it, as it constituted an abusive tax shelter." Raifman v. Comm'r, 2018 WL 3268723, at *11.[9]

---

[9] The Tax Court noted in a footnote that in "September 2005, Derivium had filed a voluntary petition for chapter 11 bankruptcy protection." Raifman v. Comm'r, T.C.M. 2018-101, 2018 WL 3268723, at *11 n.26.

The Plaintiffs

Plaintiff Jon A. Rochlis testified that he attended the Massachusetts Institute of Technology, and received a computer science/computer engineering degree in 1985. Jon A. Rochlis testified that "I went to Boston University for a certificate in financial planning, I think it was year 2000, late 1990s/2000. And I have a J.D. degree from the University of New Hampshire Law School from 2011." He testified that the between 1990 and 1991, he purchased 225 shares of Cisco stock for approximately $10,000. At trial, he stated: "I invested about $10,000 in Cisco that became about $2 million - worth about $2 million about ten years later." He further testified "I invested in a number of stocks. The ones relevant to this case include Network Appliance, Internet Security Systems, Amazon.com, Intel, Microsoft."

In the second amended complaint in Case No. 16-200T, the Rochlises[10] allege "[i]n reliance on the false pretenses regarding Derivium's hedging strategy, the Rochlises signed the Master Loan Agreement to Provide Financing and Custodial Services directly with Charles Cathcart" in 2000. The Master Loan Agreement signed by Jon A. Rochlis[11] stated in part:

---

[10] Although the plaintiffs in Case No. 16-200T are Jon A. Rochlis and Anne R. LaVin, and the plaintiffs' complaint and amended complaints refer to Jon A. Rochlis and Anne R. LaVin together as the "Rochlises," the court notes, however, only Jon A. Rochlis signed the Master Loan Agreement with Derivium. In addition, only Jon A. Rochlis testified for the plaintiffs in Case No 16-200T, as Anne R. LaVin did not testify at the trial. Similarly, as discussed below, although the plaintiffs in Case No. 16-210T are Kenneth Ishii and Sheryl A. Ishii, and the plaintiffs' complaint and amended complaints refer to Kenneth Ishii and Sheryl A. Ishii together as the "Ishiis," the court notes, however, only Kenneth Ishii signed the Master Loan Agreement with Derivium. In addition, only Kenneth Ishii testified for the plaintiffs in Case No 16-210T, as Sheryl A. Ishii did not testify at the trial. Regarding Irene M. Warren, although Irene M. Warren signed the Master Loan Agreement with Derivium, she passed away before suit was filed in this court, and the plaintiff in Case No. 201T is listed in the caption of the second amended complaint as "Jon Rochlis as Executor of the Estate of Irene M. Rochlis (aka Warren)," and Irene M. Warren did not testify at trial.

[11] The Master Loan Agreement signed by Jon A. Rochlis is substantially similar to the Master Loan Agreement signed by Irene M. Warren and Kenneth Ishii. As discussed below, the termination provisions were different in all three Master Loan Agreements. The other differences between the three Master Loan Agreements are the terms of the Schedules attached to the Master Loan Agreements identifying the securities transferred to Derivium. In addition, Kenneth Ishii's Master Loan Agreement was entered into with First Security Capital L.L.C, and not Derivium Capital, LLC.

## 1. SERVICES TO BE PROVIDED BY DC

DC [Derivium Capital, LLC] is hereby appointed Custodian of the Properties and authorized to act on behalf of the Client with respect to the Properties for the purposes of:

a) Providing or arranging financing by way of one or more loans (the "Loan(s)") in accordance with terms to be agreed upon by the parties and set out in loan term sheets and attached hereto as Schedule(s) A.

b) Holding cash, securities, or other liquid amounts (the "Client Liquid Assets") on behalf of the Client and acceptable to DC as collateral.

c) Voting shares and receiving dividends or interest on securities held as collateral.

## 2. AMOUNT & TERMS OF FINANCING

The terms of each Loan are hereby contained in the attached Schedule(s) A. The exact loan amounts will be based upon loan-to-value considerations and the results of due diligence. The net loan proceeds may be distributed at one time or on sequential dates, as instructed by Client.

## 3. FUNDING OF LOAN

The contemplated Loan(s) will be funded according to the terms identified in one or more terms sheets, which be labeled as Schedule A, individually numbered and signed by both parties, and, on signing, considered part of and merged into this Master Agreement. The Client understands that by transferring securities as collateral to DC and under the terms of the Agreement, the Client gives DC and/or its assigns the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client in not entitled to these benefits during the term of a loan. The Client agrees to assist the relevant entities in completing all requisite documents that may be necessary to accomplish such transfers.

## 4. RETURN OF CLIENT COLLATERAL

DC agrees to return, at the end of the loan term, the same number of shares of the same securities received as collateral (as conditioned in the next sentence), as set out and defined in Schedule(s) A attached hereto, upon the Client satisfying in full all outstanding loan balances, including accrued

interest. Said collateral shall reflect any and all stock splits, conversions, exchanges, mergers, or other distributions, except cash dividends credited toward interest due.

. . .

**7. INDEMNITY**

DC makes no warranties regarding DC's ability to fund or find a funder. Final terms of each Loan(s) shall be negotiated and set out in separate Loan term sheets to be attached as Schedule(s) A. Neither party is bound to any one Loan until both parties have i) executed both the MLA and the Schedule A for that Loan; ii) the Client has delivered acceptable shares; and iii) DC has initiated the establishment of hedging transactions for that Loan.

(capitalization and emphasis in original). A difference between the multiple plaintiffs' Master Loan Agreements was the termination clause at paragraph 13. Jon A. Rochlis' Master Loan Agreement[12] at paragraph 13(b) stated:

This Agreement may be terminated by either party at any time prior to the funding of a loan, in whole or in part and as cash or as credit to cover any existing obligations. At any time the Client can request that any collateral not yet committed in a DC hedging transaction be promptly returned resulting in the reductions of the amount and terms of the loan.

Irene M. Warren's termination clause stated at 13(b): "This Agreement may be terminated by either party at any time prior to the funding of a loan, in whole or in part and as cash or as credit to cover any existing obligations." As indicated above, Irene M. Warren signed the Master Loan Agreement with Derivium in 2000. Kenneth Ishii's termination clause[13] stated at 13(b):

This Agreement may be terminated by either party at any time prior to the funding of a loan, in whole or in part and as cash or as credit to cover any existing obligations. At any time the Client can request that any collateral not yet committed in an FSC hedging transaction be promptly returned resulting in the reduction of the amount and terms of the loan.

Schedule A to Jon A. Rochlis' Master Loan Agreement provides that the Rochlises transferred the following securities to Derivium between February and May of 2000:

---

[12] As indicated above, only Jon A. Rochlis signed his Master Loan Agreement.

[13] As indicated above, in the exhibits provided by the parties, only Kenneth Ishii signed his Master Loan Agreement.

| Stock[14] | Transfer Date | Shares | Value as Assigned by Derivium |
|---|---|---|---|
| AMZN | As of February 23, 2000 | 2,000 | $140,870.00 |
| CSCO | As of February 23, 2000 | 4,000 | $554,500.00 |
| CSCO | As of May 23, 2000 | 15,000 | $758,203.00 |
| INTC | As of May 23, 2000 | 1,200 | $131,850.00 |
| ISSX | As of February 25, 2000 | 2,000 | $198,250.00 |
| MSFT | As of May 23, 2000 | 1,500 | $94,781.00 |
| NTAP | As of February 25, 2000 | 1,000 | $205,438.00 |
|  | | Total Securities | $2,083,892.00 |

In response to plaintiffs' counsel's question "in 1999, 2000, why was a hedging strategy important to you?" Mr. Rochlis testified

> you asked me about did I believe that these companies would continue to increase in value, and I certainly did believe that, but they had increased in value so much, as you can see from the numbers, so recently, that I was concerned that the volatility would be high, that we might see a downturn for a while, we might see an up - I didn't really know how to judge it, but I had such - such gains that I felt I needed to try to secure those, but I also wanted to participate in what I saw as the Internet future.

Mr. Rochlis testified that he first learned of Derivium Capital in "an advertisement in the Wall Street Journal for their 90 percent stock loan." He testified that "Randolph Anderson was the person who responded to me and was the sales/marketing person at Derivium" and that he received "brochures and emails from Mr. Anderson in January of 1999."[15] Mr. Rochlis testified as to what he believed was the advantage of pursing the stock loan with Derivium,

> one of their attributes that they touted was that you own the stock. You still own your stock. You transfer it to them in escrow, and they hold it, but you still own it. Therefore, you - you benefit from - from - from an unlimited

---

[14] AMZN is the stock symbol for Amazon.com, Inc. CSCO is the stock symbol for Cisco Systems, Inc. INTC is the stock symbol for Intel Corporation. ISSX is the stock symbol for Internet Security Systems. MSFT is the stock symbol for Microsoft Corporation. NTAP is the stock symbol for NetApp Inc.

[15] Mr. Rochlis testified that one of the emails between Mr. Rochlis and Mr. Anderson referred to Mr. Rochlis' mother because she was "also interested in a Derivium transaction and was - was considering that, and this is asking Derivium to work up whether they can do it for these stocks and the terms and the like for - for actually two different loan scenarios. She only actually entered into one later" in 2000. As the parties jointly stipulate, "Irene M. Rochlis (aka Warren) passed away on March 13, 2011. Jon A. Rochlis, her son, was appointed as the Executor of her Estate." "Jon A. Rochlis as the Executor of the Estate of Irene M. Rochlis (aka Warren)" is listed as the plaintiff in the second amended complaint in Case No. 16-201T.

upside potential, which, of course, is marketing-speak, but you gain from the upside potential, again, minus the cost of the loan, but you have upside potential. It's designed that way.

Mr. Rochlis continued: "So the Derivium hedge worked in that you gave them security for a loan that was in the amount of 90 percent of the value when you transferred the securities, and they promised to deliver those securities to you in three years if you paid off the loan plus - plus interest." Regarding the arrangement with Derivium, Mr. Rochlis believed "[t]here was a term - there was a term of the agreement that said until they performed the hedge, we could demand our collateral back. Once they had done the hedge, we couldn't do it. Then we were locked into the three years."

Mr. Rochlis explained at trial why he decided to move forward with Derivium, first, indicating that he "wouldn't have done it without the marketing brochures, particularly Charles Cathcart's experience in creating derivatives, because you couldn't just buy this off the shelf." In response to plaintiffs' counsel's question: "So what were the advantages of the model proposed by Charles Cathcart?" Mr. Rochlis testified

the advantages are you have got downside protection of 90 percent, you had upside potential if the stock rose above 120 percent of the value when you went into it, which, as you - as I have said, the stocks had certainly done - shown their ability to do that in the past. It was also somewhat less expensive than publicly traded options, and the term was for three years, and it was easy to do, where you didn't have three-year options, and so you had to keep rolling over the stock - the options, rather, when they expired every six months or something like that, which was a - would have been a lot of work and possibly more expensive as the stock prices would - would fluctuate.

Regarding the failure of Derivium to complete the transaction, plaintiffs' counsel asked Mr. Rochlis, "[w]hen did you find out that they hadn't done the hedge?" and Mr. Rochlis responded that "[y]ou and some other attorneys contacted me in late 2012, early 2013." Mr. Rochlis testified that "Randolph Anderson represented to me that they would not sell the stock without hedging it. As a matter of fact, I think he said they would be crazy or insane. That's a conversation I remember pretty well for how long ago it was." Mr. Rochlis continued: "And similarly, I got comfortable with Derivium doing that because they were the derivatives and hedging gurus and experts, and they admitted that it would be crazy to sell the stock without putting a hedge in place." Mr. Rochlis testified in response to the question, "[w]hy did you file your theft loss claim [with the IRS] in 2009?" "because that was the first year, given the stipulations, that we could have known that there was actual - there was an actual mens rea, there was an actual intent, scienter on the part of Cathcart to steal - to fraudulently deprive us of our property." Mr. Rochlis testified that "Derivium never told us that they had assigned, pledged, sold, or anything to the collateral. They gave us statements every quarter for the duration showing how many shares they were holding for us. In fact, those were adjusted for splits. They showed dividends. That reduced interest." Mr. Rochlis continued:

> They expressly promised to me that they would not sell my securities without a hedge, but they did, and so they robbed me of the upside potential of my stocks, and they did that the first day when they sold my shares in order to give me the 90 percent. They led me to believe that they would hold those shares or that they would hedge them. They didn't do that.

Regarding the tax implications, Mr. Rochlis testified that in

> 2003, when - when we defaulted on the loans, we reported a capital - a gain, a recognition event, with gross proceeds of the 90 percent that we had received, plus the roughly 30 percent - a little bit more because it was 10 1/2 percent a year - of interest as part of the gross proceeds, as cancellation of debt income, as Attorney Byrnes advised us and also advised us that it would be of capital gain character.

Mr. Rochlis also testified at the trial that he consulted an attorney about the Derivium transaction, Mr. Daniel Byrnes, "in late 1999." Mr. Byrnes conveyed to Mr. Rochlis that

> in his opinion, they were not constructive sales; they were loans. He advised us that - because I wanted to understand what our obligations were and our obligations, in the event that we wound up eventually defaulting on the loans, what also - what we would report when that happened, and he advised that at that point we would have a recognition event that was - with a gross proceeds of the 90 percent that we had obtained in cash, plus the accrued interest that we had not paid as a cancellation of debt income.

On cross-examination, Mr. Rochlis testified that the only personal property that he owned that was transferred to Derivium was the stock. In response to the government's question: "But you never made any attempt to get any of your collateral back at any time until the end of the loan term?" Mr. Rochlis responded: "That's correct."

In addition, regarding the upside potential if the stock rose above 120 percent of the value of the securities,[16] defendant's counsel asked Mr. Rochlis on cross-examination, "[a]nd, in fact, you never sought to exercise that right under the contract, correct?" To which Mr. Rochlis responded: "I did not." Defendant's counsel continued: "And that's because, in your case, none of the stocks were worth - had appreciated more than 120 percent of their original value." Mr. Rochlis responded that "at the end of the term, that was the case. The first day, when they stole the stock, that was not the case." Mr. Rochlis statement at trial about stealing led to this exchange with defendant's counsel: "But if they stole the stock on day one, then there is no potential appreciation, is there?

---

[16] Mr. Rochlis testified at trial that he had the option to have his stock returned to him if he had paid the principal plus interest, or approximately 120 percent of the value of the stock. Schedule A to the Master Loan Agreements provides that the interest rate for the loans was "10.50%, compounded annually, accruing until and due at maturity."

Your property has been stolen. You would have the right to get your property back. The potential appreciation would only exist with regard to what might happen down the road." Mr. Rochlis responded:

> That's - well, that's - no, the contractual obligation is to provide the financial equivalent of a call option, and they didn't do that. They didn't do that. Why didn't they do that? They didn't do that because they sold the stock without engaging in the hedging transactions that they represented they would. Had they done that, they could have delivered.

At trial, Mr. Rochlis and defendant's counsel discussed at some length the decision to exercise the option to surrender the various stocks.[17] Defendant's counsel identified for Mr. Rochlis four documents that Mr. Rochlis had signed, in each one, choosing the option "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation," instead of "I/we will be paying off my/our loan and request the return of my/our collateral," or "I/we would like to renew or refinance this transaction for an additional term of 3 years." For the three loans with maturity dates of March 16, 2003, Mr. Rochlis exercised the surrender option on February 3, 2003, and for the loan with the maturity date of March 23, 2003, Mr. Rochlis exercised the surrender option on March 11, 2003. Although Mr. Rochlis signed the various documents selecting the option "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation," at trial Mr. Rochlis contended "I will point out that I didn't voluntarily surrender it, as you maintain, because they had already stolen it. I mean, you can't surrender something that someone stole under false pretenses."

Mr. Rochlis also testified that his mother, Ms. Irene M. Warren, "only wound up doing one transaction with Derivium for about 3000 shares of Cisco stock, about $200,000 worth of Cisco stock." Pursuant to the Master Loan Agreement, Irene M. Warren transferred approximately $200,000 of Cisco stock to Derivium on June 7, 2000. In the second amended complaint in Case No. 16-201T, alleges that "[i]n reliance on the false pretenses regarding Derivium's hedging strategy, Irene M. Rochlis signed the Master Loan Agreement to Provide Financing and Custodial Services directly with Charles Cathcart. Irene M. Rochlis parted with the following security by transferring it to Derivium on June 7, 2000."

| Stock | Transfer Date | Shares | Value as Assigned by Derivium |
|-------|---------------|--------|-------------------------------|
| CSCO | As of June 7, 2000 | 3,148 | $197,931.00 |

Plaintiff Kenneth Ishii also testified at the trial. He testified that he attended the Massachusetts Institute of Technology, and joined the company Accordance, and that "I was around employee number 12." Mr. Ishii received stock options and after he joined Accordance it merged with Software.com in the "fall of 1986." As a result, his Accordance

---

[17] Mr. Rochlis testified: "That was for all of my loans, and my mother would have done the same thing, and I'm sure you have a document in here about that as well, but if you don't, I'm sure she did."

options "got rolled over into new options in Software.com."[18] At the time of his first transaction with Derivium, Mr. Ishii testified that the value of the Software.com stock "was probably on the order of 10 million [dollars] at that point."

In the amended complaint in Case No. 16-210T, the Ishiis allege "[i]n reliance on the false pretenses regarding Derivium's hedging strategy, the Ishiis signed the Master Loan Agreement to Provide Financing and Custodial Services directly with Charles Cathcart. The Ishiis parted with the following securities by transferring them to Derivium."

| Stock | Transfer Date | Shares | Value as Assigned by Derivium |
|-------|---------------|--------|-------------------------------|
| SWCM | As of December 21, 1999 | 50,000 | $4,800,000.00 |
| SWCM | As of January 10, 2000 | 28,000 | $2,567,250.00 |
| SWCM | As of March 16, 2000 | 7,353 | $944,861.00 |
| SWCM | As of September 20, 2000 | 11,024 | $1,760,395.00 |
| | | Total Securities | $2,083,892.00 |

Mr. Ishii entered into an agreement with Derivium in December of 1999, and explained at trial why the Derivium approach appealed to him:

> Well, all of my net worth was tied up in Software.com, and I really - you know, I had a young family and one on the way, and I wanted to protect that. And, you know, I just - you know, we just couldn't predict the future, and so we wanted to make sure that we - you know, as - as the pitch was, it was, you know, protect your downside and retain your upside. And that sounded just - you know, just like what I wanted.

Mr. Ishii testified that, to his knowledge, there was not a hedge available to him for Software.com, indicating that "my belief is that there – the stock was so new and so volatile that there really wasn't a market for it yet."

Mr. Ishii testified that he learned of Derivium "[e]arly in 1999, Mr. Rochlis told me about them," and Mr. Ishii explained that he and Mr. Rochlis have been good friends since approximately 1985. Mr. Ishii also testified "I also talked to Mr. Rochlis about, you know, what he had done and what my options there were, and it didn't really sound like, sort of on the public options market, there was any market for, you know, a brand new startup like Software.com, so that didn't really seem to be a possibility."

Regarding Derivium, Mr. Ishii explained, "I got standard marketing literature, and then eventually I - I don't remember how it was arranged, but I had a phone call with Randolph Anderson, and we talked about the different programs they had available and how - how they applied to my situation, and he described them, and - you know, and we moved forward from there." Mr. Ishii emphasized that Mr. Anderson explained "the tax consequences of the event, and he said there were none. He also discussed how the 90 percent was an important number, because the 10 percent made it a significant risk, and so it wasn't deemed a sale by the IRS."

---

[18] The stock symbol for Software.com, Inc. is SWCM.

At trial, Mr. Ishii gave his view on how the Derivium hedge would work:

> My understanding was that they - they had someone - you know, they would get the money together, and I would give them the stock, and they would hedge however they were going to do, and whatever the value of that hedge was, I would get 90 percent of that value as a loan for the - for three years. And it was, you know, locked up for those three years, and it was nonrecourse, and that over that time, it would be 10 1/2 percent interest per year.

Mr. Ishii reiterated his belief that "I still continued to own the stock even though they held it, and, you know, so there was no sale. There was - and at the end of the loan period, I could pay back the loan, and I would get my stock back, and - and, you know, if it increased in value, I would - you know, I would have that gain." At trial, plaintiffs' counsel had Mr. Ishii read portions of the Master Loan Agreement between Mr. Ishii and Derivium. Specifically, Mr. Ishii read paragraph 13(b) which stated:

> This Agreement may be terminated by either party at any time prior to the funding of a loan, in whole or in part and as cash or as credit to cover any existing obligations. At any time the Client can request that any collateral not yet committed in an FSC hedging transaction be promptly returned resulting in the reduction of the amount and terms of the loan.

Mr. Ishii testified that "I believe this - this meant that they had to be able to return the stock to me and up until the time it was hedged. So a hedge had to exist." Mr. Ishii testified that he entered four total hedges with Derivium. For each one he testified that he "believed that they [Derivium] had hedged my stock, that they had entered into some contract protecting it."

In response to the question from plaintiffs' counsel: "So what do you believe that Derivium stole from you?" Mr. Ishii responded, "I believe they stole the upside on my stock, that they really - you know, by selling it with no guaranteed way of getting it back, at that point, it was - you know, if it had taken off, they were - I was - there was no way for them to get it back for me." In response to the question, "[d]o you recall having any knowledge of any court decisions that have been entered or judgments entered in any of the litigation against Derivium prior to 2009 that - where the Court found that Derivium had committed fraud with respect to the 90 percent loan transaction?" Mr. Ishii responded: "I do not believe I ever - I ever heard those - those things, so no."

On cross examination, Mr. Ishii agreed that one of the advantages that Mr. Anderson highlighted for Mr. Ishii was the ability to defer capital gains tax, and Mr. Ishii further agreed he was able to defer capital gains tax with regard to the 90 percent cash he received. Mr. Ishii also had the following exchange with defendant's counsel on cross examination:

Q. And then it's protect your wealth, and this refers to significant losses can come quickly and - in other words, that's the downside protection by cashing out 90 percent of the value of your stock.

A. That looks like what that point's about.

Q. And, in fact, you did get the downside protection, because you did cash out 90 percent of the value of your stock.

A. Yes.

Q. Okay. And, in fact, there was volatility and there were, in fact, significant losses incurred with respect to the Software.com stock that you transferred to Derivium.

A. Yes, but I didn't know that at the time.

Q. But you were protected. If you had held your stock and it had gone down, you would have lost a substantial portion of the gain that was built into that stock, correct; in other words, your appreciation?

A. Yeah, well, depending on when I sold, I would have either gotten some appreciation or lost some, depending.

Q. Okay. And if you had just sold it, you would, of course, had to have paid tax on it at the time of that sale, correct?

A. Of course.

Like Mr. Rochlis, Mr. Ishii elected to surrender the collateral rather than pay the principal and interest due on his loan. Defendant's counsel asked Mr. Ishii on cross examination, "because the stock was worth a tiny fraction of what the loan - the principal and interest due on the loan was, you elected to surrender your stock and walk away from the deal?" Mr. Ishii responded: "Yeah, I elected to - to surrender the collateral." In response to the question, "as a result of surrendering the collateral and walking away from the loan, you were not required to make any payment to Derivium at the end of the transaction," Mr. Ishii responded: "Correct." Mr. Ishii confirmed he repeated this process with all four of the transactions, and agreed with defendant's counsel that in "all the other instances, the value of the stock was substantially less than what you would have had to have paid to get it back."

The plaintiffs all allege "they discovered that on November 19, 2009 Derivium's president, Charles Cathcart entered into a stipulation with the United States Department of Justice that he acted with scienter in making false representations about the hedging transaction and the 90% Stock Loan." Regarding the Rochlises, the second amended complaint in Case No. 16-200T alleges:

The Rochlises timely filed their protective claim on a 2009 1040X . . . to report to the Derivium theft loss on July 22, 2013 under the three year statute of limitations under I.R.C. § 6511(a). Once they received the expert report from Moss Adams, they timely filed their 2009 1040X on September 9, 2014 to report their theft loss of $896,308. On their 2009 1040X the Rochlises requested a tax refund of $4,873.00

Regarding Irene M. Warren, the second amended complaint in Case No. 16-201T similarly alleges that

The Estate of Irene M. Rochlis timely filed a protective claim on a 2009 1040X . . . to report to the Derivium theft loss on July 22, 2013 under the three year statute of limitations under I.R.C. § 6511(a). Once the estate received the expert report from Moss Adams, the Executor timely filed a 2009 1040X on September 9, 2014 to report theft loss of $75,672. The Estate of Irene M. Rochlis requested a tax refund of $19,519.

Regarding the Ishiis, the amended complaint in Case No. 16-210T alleges, "[t]he Ishiis timely filed their protective claim on a 2009 1040X . . . to report to the Derivium theft loss on July 22, 2013 under the three year statute of limitations under I.R.C. § 6511(a)," and "[t]he Ishiis have satisfied the requirements of I.R.C. § 7422(a) because more than six months have elapsed since said Claim for Refund was filed and said Claim has neither been allowed nor disallowed by the Internal Revenue Service." The amended complaint in Case No. 16-210T indicated that the Ishiis also engaged Moss Adams LLP "to provide an expert opinion on the valuation of the options to repurchase the stock."

All plaintiffs argue that they can prove they are victims of theft loss, because Charles Cathcart made false statements which he knew were false, he made those false statements with the intent that the plaintiffs should rely on them, that the plaintiffs did rely on them, and plaintiffs parted with their personal property as a result. In the amended complaints, separate from the lower amounts they claimed on their 2009 Forms 1040X, the Rochlises sought judgment in the amount of $68,703.00,[19] the Ishiis sought a

---

[19] The Rochlises included the following table in the second amended complaint for Case No. 16-200T:

| Tax Year | Refund |
| --- | --- |
| 2009 | $4,873 |
| 2006 | $21,645 |
| 2007 | $10,161 |
| 2008 | $8,885 |
| 2010 | $2,063 |
| 2011 | $0 |
| 2012 | $19,598 |
| 2013 | $1,478 |
| | $68,703 |

judgment in the amount of $208,344.00,[20] and the Estate of Irene Rochlis sought judgment in the amount of $19.519.00.[21]

As indicated above, trial was held, the parties submitted post-trial briefs and the court held closing argument. The parties subsequently submitted supplemental briefs to address the issues the court identified at closing argument.

## DISCUSSION

Plaintiffs seek tax refunds for alleged theft losses for the Derivium fraud.[22] As noted above, the plaintiffs sought to amend their 2009 taxes by filing Forms 1040X in 2013. The Rochlises seek a cumulative tax refund in the amount of $68,703.00, Irene M. Warren seeks a tax refund of $19.519.00, and the Ishiis seek a cumulative tax refund in the amount of $208,344.00. The United States Supreme Court has stated that: "A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims." United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008) (citing both 28 U.S.C. § 1346(a)(1) and EC Term of Years Trust v. United States, 550 U.S. 429, 431, & n.2 (2007)); see also Manor Care, Inc. v. United States, 89 Fed. Cl.

---

[20] The Ishiis included the following table in the amended complaint for Case No. 16-210T:

| Tax Year | Refund |
| --- | --- |
| 2009 | $0 |
| 2006 | $27,076 |
| 2007 | $62,329 |
| 2008 | $30,353 |
| 2010 | $7,635 |
| 2011 | $38,925 |
| 2012 | $42,026 |
| Total Tax Refund | $208,344 |

[21] Unlike the Rochlises and the Ishiis, Irene M. Warren did not include a table in the second amended complaint in Case No. 16-201T, and only requested a tax refund in the amount of $19.519.00 for tax year 2009.

[22] Plaintiffs Jon A. Rochlis, Anne R. LaVin, and Irene M. Warren filed one, common post-trial brief and plaintiffs Kenneth Ishii and Sheryl Ishii filed a separate post-trial brief. As defendant notes in its post-trial brief, "[a]n examination of the two briefs reveals that other than the factual statements and different stock values used in the expert's reports, the arguments advanced in each of the two briefs are the same." This is consistent with the plaintiffs' approach to the trial. As noted above, the court generically refers to all the plaintiffs as "the plaintiffs," but specifically identifies individual plaintiffs by name when discussing specific transactions, or when otherwise appropriate.

618, 622 (2009) (citing <u>Flora v. United States</u>, 362 U.S. 145, 177, <u>reh'g denied</u>, 362 U.S. 972 (1960)); <u>Shore v. United States</u>, 9 F.3d 1524, 1527 (Fed. Cir. 1993) and 28 U.S.C. § 1346(a)), <u>aff'd</u>, 630 F.3d 1377 (Fed. Cir. 2011); <u>Strategic Hous. Fin. Corp. v. United States</u>, 86 Fed. Cl. 518, 530 (citing <u>United States v. Clintwood Elkhorn Mining Co.</u>, 553 U.S. at 4), <u>motion to amend denied</u>, 87 Fed. Cl. 183 (2009), <u>aff'd in part</u>, <u>vacated in part on other grounds</u>, 608 F.3d 1317 (Fed. Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 1513 (2011); <u>Buser v. United States</u>, 85 Fed. Cl. 248, 256 (2009) ("It is 'undisputed' that the Court of Federal Claims possesses the authority to adjudicate tax refund claims.") (citations omitted); <u>RadioShack Corp. v. United States</u>, 82 Fed. Cl. 155, 158 (2008) ("This Court has jurisdiction to consider tax refund suits under 28 US.C. § 1491(a)(1).") (citations omitted), <u>aff'd</u>, 566 F.3d 1358 (Fed. Cir. 2009).

Section 1346 of Title 28 of the United States Code provides that:

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: (1) Any civil action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal revenue laws. . . .

28 U.S.C. § 1346(a)(1) (2018).

For this court to exercise its jurisdiction over plaintiffs' federal tax refund claim, a petitioning party must first satisfy the tax refund schematic detailed in Title 26 of the Internal Revenue Code, which establishes that a claim for refund must be filed with the IRS before filing suit in federal court, and establishes strict deadlines for filing such claims. <u>See</u> 26 U.S.C. §§ 6511, 7422 (2018).[23] In <u>United States v. Clintwood Elkhorn Mining Co.</u>, the United States Supreme Court indicated that:

A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims. The

---

[23] The statute at 26 U.S.C. § 7422(a) states:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a).

Internal Revenue Code specifies that before doing so, the taxpayer must comply with the tax refund scheme established in the Code. That scheme provides that a claim for a refund must be filed with the Internal Revenue Service (IRS) before suit can be brought, and establishes strict timeframes for filing such a claim.

United States v. Clintwood Elkhorn Mining Co., 553 U.S. at 4 (citations omitted); see also RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009) ("[I]n the context of tax refund suits, the [Supreme] Court has held that the Court of Federal Claims's Tucker Act jurisdiction is limited by the Internal Revenue Code, including 26 U.S.C. § 7422(a)."); United States v. Dalm, 494 U.S. 596, 609-10, reh'g denied, 495 U.S. 941 (1990); Buser v. United States, 85 Fed. Cl. at 256. Moreover, for a refund claim, the court only may hear claims for which the petitioning taxpayer has fulfilled all of his or her tax liabilities for the tax year in question before the refund claim is heard. Flora v. United States, 357 U.S. 63, 72-73 (1958) (Flora I), aff'd on reh'g, 362 U.S. 145 (Flora II), reh'g denied, 362 U.S. 972 (1960). In Flora II, the United States Supreme Court reiterated that 28 U.S.C. § 1346(a)(1) requires "payment of the full tax before suit. . . ." Flora II, 362 U.S. at 150-51; see also Computervision Corp. v. United States, 445 F.3d 1355, 1363 (Fed. Cir.), reh'g and reh'g en banc denied, 467 F.3d 1322 (Fed. Cir. 2006), cert. denied, 549 U.S. 1338 (2007); Shore v. United States, 9 F.3d at 1526 ("The full payment requirement of Section 1346(a)(1) and Flora applies equally to tax refund suits brought in the Court of Federal Claims. . . .") (citations omitted).

Essentially, section 7422(a) functions as a waiver of the government's sovereign immunity in tax refund suits. Chicago Milwaukee Corp. v. United States, 40 F.3d 373, 374 (Fed. Cir. 1994), reh'g and reh'g en banc denied, 141 F.3d 1112 (Fed. Cir.), cert. denied, 525 U.S. 932 (1998); see also Gluck v. United States, 84 Fed. Cl. 609, 613 (2008). "[S]ection 7422(a) creates a jurisdictional prerequisite to filing a refund suit." Id. (citing Chicago Milwaukee Corp. v. United States, 40 F.3d at 374 (citing Burlington N., Inc. v. United States, 231 Ct. Cl. 222, 684 F.2d 866, 868 (1982))). Once a party has established compliance with 26 U.S.C. § 7422(a), the party may, if successful, also recover interest for its refund claim. See Deutsche Bank AG v. United States, 95 Fed. Cl. 423, 427 n.3 (2010) (citing Brown & Williamson, Ltd. v. United States, 231 Ct. Cl. 413, 688 F.2d 747, 752 (1982)) ("There is no question, however, that this court has subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2006), over claims, such as the present one, seeking to recover statutory interest on income tax refunds.").

Furthermore, as noted above, in order for a tax refund case to be duly filed in a federal court pursuant to section 7422(a), the filing must comply with the timing requirements set forth in 26 U.S.C. § 6511(a):

The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress. A necessary corollary of this rule is that when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied. When waiver

> legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity.

Block v. North Dakota ex rel. Bd. of Univ. and School Lands, 461 U.S. 273, 287 (1983); see also Buser v. United States, 85 Fed. Cl. at 257. The applicable language of section 6511(a) states:

> Claim for credit or refund of an overpayment of any tax imposed by this title . . . shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. . . .

26 U.S.C. § 6511(a); see also Treas. Reg. § 301.6511(a)-1 (2019) ("In the case of any tax. . . . If a return is filed, a claim for credit or refund of an overpayment must be filed by the taxpayer within 3 years from the time the return was filed or within 2 years from the time the tax was paid, whichever of such periods expires the later."). As articulated by the United States Supreme Court in Commissioner v. Lundy, 516 U.S. 235 (1996):

> A taxpayer seeking a refund of overpaid taxes ordinarily must file a timely claim for a refund with the IRS under 26 U.S.C. § 6511. That section contains two separate provisions for determining the timeliness of a refund claim. It first establishes a filing deadline: The taxpayer must file a claim for a refund "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid." 26 U.S.C. § 6511(b)(1) (incorporating by reference 26 U.S.C. § 6511(a)). It also defines two "look-back" periods: If the claim is filed "within 3 years from the time the return was filed," ibid., then the taxpayer is entitled to a refund of "the portion of the tax paid within the 3 years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(A) (incorporating by reference 26 U.S.C. § 6511(a)). If the claim is not filed within that 3-year period, then the taxpayer is entitled to a refund of only that "portion of the tax paid during the 2 years immediately preceding the filing of the claim." 26 U.S.C. § 6511(b)(2)(B) (incorporating by reference § 6511(a)).

Comm'r v. Lundy, 516 U.S. at 239-40 (footnote omitted); see also United States v. Clintwood Elkhorn Mining Co., 553 U.S. at 8 (determining that the language of section 6511(a) clearly states that taxpayers "must comply with the Code's refund scheme before bringing suit, including the requirement to file a timely administrative claim."). The Supreme Court in Lundy also noted that a timely filing was a prerequisite for the United States Court of Federal Claims to have jurisdiction for a refund claim. See Comm'r v. Lundy, 516 U.S. at 240.

In sum, Congress has provided strict statutory guidelines laying out the statute of limitations for the filing of a federal tax refund claim:

> Read together, the import of these sections is clear: unless a claim for refund of a tax has been filed within the time limits imposed by § 6511(a), a

suit for refund, regardless of whether the tax is alleged to have been "erroneously," "illegally," or "wrongfully collected," §§ 1346(a)(1), 7422(a), may not be maintained in any court.

United States v. Dalm, 494 U.S. at 602.

Under the United States Tax Code, at 26 U.S.C. § 165, titled: "Losses," "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a) (2018). The Tax Code specifically provides for a theft loss, and states that "[f]or purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." 26 U.S.C. § 165(e). Treasury Regulations § 1.165-8(a), titled: "Theft losses," states:

Allowance of deduction. (1) Except as otherwise provided in paragraphs (b) and (c) of this section, any loss arising from theft is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. See section 165(c)(3).

(2) A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. See section 165(e). Thus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss. However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see paragraph (d) of § 1.165–1.

(3) The same theft loss shall not be taken into account both in computing a tax under chapter 1, relating to the income tax, or chapter 2, relating to additional income taxes, of the Internal Revenue Code of 1939 and in computing the income tax under the Internal Revenue Code of 1954. See section 7852(c), relating to items not to be twice deducted from income.

Treas. Reg. § 1.165-8(a) (2019).[24]

---

[24] Treasury Regulation § 1.165-8(b)-(c) provide:

(b) Loss sustained by an estate. A theft loss of property not connected with a trade or business and not incurred in any transaction entered into for profit which is discovered during the settlement of an estate, even though the theft actually occurred during a taxable year of the decedent, shall be allowed as a deduction under sections 165(a) and 641(b) in computing the taxable income of the estate if the loss has not been allowed under section 2054 in computing the taxable estate of the decedent and if the statement has been filed in accordance with § 1.642(g)–1. See section 165(c)(3). For purposes of determining the year of deduction, see paragraph (a)(2) of this section.

According to the definition of theft loss, Treasury Regulation § 1.165-8, provides "[f]or purposes of this section the term 'theft' shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery." Treas. Reg. § 1.165-8(d). The term "theft" does not have a more specific definition in the Tax Code or in the Treasury Regulations. See Adkins v. United States, 113 Fed. Cl. 797, 804 (2013) ("Neither IRC § 165 nor its implementing regulations provide any further guidance for what constitutes a theft.") (footnote omitted). As noted by a Judge of this court:

> The regulations, however, stop there in terms of providing any further guidance on how to determine whether particular conduct amounts to "theft" or any one of these other enumerated crimes. Like the parties here, many cases seek further guidance on this point from state law, often citing Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956), for the proposition that "whether a loss from theft occurs within the purview of [section 165(c)(3)] . . . depends upon the law of the jurisdiction where it was sustained." From this point, many courts embark on an extended analysis of whether the actions that occasioned the loss of funds constituted one of the requisite theft crimes under state criminal laws.

Goeller v. United States, 109 Fed. Cl. 534, 539-40 (2013) (alterations in original) (footnote omitted).

The parties agree that the burden of establishing that a deductible loss, including that a theft loss occurred, rests with the plaintiffs. See Boehm v. Comm'r, 326 U.S. 287, 294 (1945) ("Here it was the burden of the taxpayer to establish the fact that there was a deductible loss in 1937."), reh'g denied, 326 U.S. 811 (1946); Krahmer v. United States, 810 F.2d 1145, 1147 (Fed. Cir. 1987) (recognizing the difficulty to prove intent using circumstantial evidence in a theft loss deduction case, but holding that the United States Claims Court did not place too high a burden of proof on a taxpayer to establish that a deductible loss occurred); Jeppsen v. Comm'r, 128 F.3d 1410, 1418 (10th Cir. 1997)

--------

> (c) Amount deductible. The amount deductible under this section in respect of a theft loss shall be determined consistently with the manner prescribed in § 1.165–7 for determining the amount of casualty loss allowable as a deduction under section 165(a). In applying the provisions of paragraph (b) of § 1.165–7 for this purpose, the fair market value of the property immediately after the theft shall be considered to be zero. In the case of a loss sustained after December 31, 1963, in a taxable year ending after such date, in respect of property not used in a trade or business or for income producing purposes, the amount deductible shall be limited to that portion of the loss which is in excess of $100. For rules applicable in applying the $100 limitation, see paragraph (b)(4) of § 1.165–7. For other rules relating to the treatment of deductible theft losses, see § 1.1231–1, relating to the involuntary conversion of property.

Treas. Reg. § 1.165-8(b)-(c).

(noting that the plaintiff bears the burden of proving entitlement to a theft loss deduction), cert. denied, 524 U.S. 916 (1998); Howard v. United States, 497 F.2d 1270, 1272 n.4 (7th Cir. 1974) ("Plaintiffs, of course, had the burden of establishing that a theft occurred."). If a taxpayer is unable to establish the elements of the crime of theft under the applicable state law, the taxpayer cannot be allowed a deduction under 26 U.S.C. § 165. The Federal Circuit in Krahmer concluded that under 26 U.S.C. § 165, the "appropriate burden is proof by a preponderance of the evidence." Krahmer v. United States, 810 F.2d at 1147; see also Bunch v. Comm'r, T.C.M. 2014-177, 2014 WL 4251136, at *6 (T.C. Aug. 28, 2014); Marine v. Comm'r, 92 T.C. 958, 976 (1989); Allen v. Comm'r, 16 T.C. 163, 166, 1951 WL 73 (1951).

While a theft conviction may establish conclusively the existence of a theft under 26 U.S.C. § 165(e), the lack of such a conviction does not necessarily preclude a theft loss deduction pursuant to 26 U.S.C. § 165(e), provided that the requisite specific intent to deprive is present. See Vietzke v. Comm'r, 37 T.C. 504, 510 (1961) (holding that a theft had occurred for purposes of 26 U.S.C. § 165(e), even though the alleged perpetrator of the theft was not convicted of a theft crime).

The Treasury Regulations for theft loss provide that a plaintiff is not entitled to a theft loss deduction until the plaintiff cannot demonstrate with reasonable certainty if a possibly of recovery exists. Treasury Regulation § 1.165–1(d)(3) provides that

> if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained . . . until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

Treas. Reg. § 1.165–1(d)(3) (2019); see also Jeppsen v. Comm'r, 128 F.3d at 1418 (10th Cir. 1997) (noting taxpayers are "not entitled to take the theft loss deduction" in a year if the "prospect of recovery was simply unknowable"); Adkins v. United States, 113 Fed. Cl. at 807. The Treasury Regulations also state that "[w]hether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances." 26 C.F.R. § 1.165–1(d)(2)(i); see also Adkins v. United States, 113 Fed. Cl. at 807; United States v. Elsass, 978 F. Supp. 2d 901, 915 (S.D. Ohio 2013) ("The Government . . . contends that the theft losses claimed by the Defendants on behalf of their ABFS [American Business Financial Services] customers were improper and ignored the legal requirements for § 165 theft-loss deductions that the loss involve criminal intent and that the loss be claimed only after the taxpayer can establish with reasonable certainty that no recovery will be made. The Court agrees."), aff'd, 769 F.3d 390 (6th Cir. 2014).

In addition to proving the loss, the plaintiffs are required to prove of the amount of the loss. See Washington Mut., Inc. v. United States, 130 Fed. Cl. 653, 686-87 (2017) (citing United States v. Janis, 428 U.S. 433, 440 (1976)) ("[P]laintiffs bear the burden to prove, by a preponderance of the evidence, that they are entitled to the tax deductions at issue in this case and the correct amount of the tax refund due."), aff'd sub nom., WMI

Holdings Corp. v. United States, 891 F.3d 1016 (Fed. Cir. 2018). As indicated in Washington Mutual, "plaintiffs will not recover in a tax refund case if they cannot prove the amount of the refund due." Id. at 687.

As noted above, regarding the Rochlises, the second amended complaint in Case No. 16-200T alleges:

The Rochlises timely filed their protective claim on a 2009 1040X . . . to report to the Derivium theft loss on July 22, 2013 under the three year statute of limitations under I.R.C. § 6511(a). Once they received the expert report from Moss Adams, they timely filed their 2009 1040X on September 9, 2014 to report their theft loss of $896,308. On their 2009 1040X the Rochlises requested a tax refund of $4,873.

Regarding Irene M. Warren, the second amended complaint in Case No. 16-201T alleges that:

The Estate of Irene M. Rochlis timely filed a protective claim on a 2009 1040X . . . to report to the Derivium theft loss on July 22, 2013 under the three year statute of limitations under I.R.C. § 6511(a). Once the estate received the expert report from Moss Adams, the Executor timely filed a 2009 1040X on September 9, 2014 to report theft loss of $75,672. The Estate of Irene M. Rochlis requested a tax refund of $19,519.

Regarding the Ishiis, the amended complaint in Case No. 16-210T alleges, "[t]he Ishiis timely filed their protective claim on a 2009 1040X . . . to report to the Derivium theft loss on July 22, 2013 under the three year statute of limitations under I.R.C. § 6511(a), and "[t]he Ishiis have satisfied the requirements of I.R.C. § 7422(a) because more than six months have elapsed since said Claim for Refund was filed and said Claim has neither been allowed nor disallowed by the Internal Revenue Service."

Defendant argues that "[e]ven if plaintiffs could establish that something of value was taken from them, the evidence presented at the trial of this case establishes that plaintiffs are not entitled to any refund. First, no theft loss was sustained in 2009, the year for which plaintiffs seek a refund." By contrast, plaintiffs argue that "2009 is the correct year for the theft-loss deduction because that is the first year Plaintiffs could meet their burden of proof."

As noted above, Treasury Regulation § 1.165-8(a)(1), states in part, "any loss arising from theft is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained," and Treasury Regulation § 1.165-8(a)(2) provides that "[a] loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss," and "[t]hus, a theft loss is not deductible under section 165(a) for the taxable year in which the theft actually occurs unless that is also the year in which the taxpayer discovers the loss." Treas. Reg. § 1.165-8(a). Pursuant to the Master Loan Agreements, the Rochlises transferred more than two

million dollars' worth of securities to Derivium in February and May of 2000,[25] Irene M. Warren transferred approximately $200,000 of Cisco stock to Derivium on June 7, 2000, and the Ishiis transferred more than two million dollars' worth of securities to Derivium between December 1999 and September 2000.[26]

As made clear from the joint stipulations and the testimony at trial, "the claim that the 90% Loan Program involved 'hedging' is false or fraudulent. No funds were used to hedge any 90% Loan transactions. Cathcart's claim that the use of the 90% Loan proceeds . . . constituted hedges against securities was pure fiction and constituted nothing more than an economic gamble." Moreover, as early as 2001, Derivium began defaulting on its obligations to its clients "when the first transactions engaged in by Derivium in 1998 began maturing," and "Derivium defaulted because Derivium had no genuine hedges in place, had no reserves, and the proceeds from new 90% Loan transactions were insufficient to allow Derivium to purchase the replacement securities on the open market for those customers who did seek a return of their highly appreciated stocks." Although any theft arising from the fraudulent transactions from 1999 or 2000 may have occurred in those years, the parties agree that the parties did not discover, or could not have discovered, the fraud in 1999 or 2000.[27]

---

[25] As indicated above, the Rochlises transferred the following securities to Derivium:

| Stock | Transfer Date | Shares | Value as Assigned by Derivium |
|-------|---------------|--------|-------------------------------|
| AMZN | As of February 23, 2000 | 2,000 | $140,870.00 |
| CSCO | As of February 23, 2000 | 4,000 | $554,500.00 |
| CSCO | As of May 23, 2000 | 15,000 | $758,203.00 |
| INTC | As of May 23, 2000 | 1,200 | $131,850.00 |
| ISSX | As of February 25, 2000 | 2,000 | $198,250.00 |
| MSFT | As of May 23, 2000 | 1,500 | $94,781.00 |
| NTAP | As of February 25, 2000 | 1,000 | $205,438.00 |
| | | Total Securities | $2,083,892.00 |

[26] As indicated above, the Ishiis transferred the following securities to Derivium:

| Stock | Transfer Date | Shares | Value as Assigned by Derivium |
|-------|---------------|--------|-------------------------------|
| SWCM | As of December 21, 1999 | 50,000 | $4,800,000.00 |
| SWCM | As of January 10, 2000 | 28,000 | $2,567,250.00 |
| SWCM | As of March 16, 2000 | 7,353 | $944,861.00 |
| SWCM | As of September 20, 2000 | 11,024 | $1,760,395.00 |
| | | Total Securities | $2,083,892.00 |

[27] Defendant's post-trial brief, citing the parties' joint stipulations, states:

It is also stipulated that Derivium did not begin defaulting on its obligation to replace customers until October 2001. Therefore, in 1999 and 2000, when plaintiffs transferred their stocks to Derivium, it was not certain that Derivium would not have replaced those stocks in 2002 and 2003, when the loan terms ended, in the event plaintiffs sought a return of those stocks.

Plaintiffs argue that 2009 is the correct year to use, as

[p]laintiffs submit that until Cathcart's 2009 admissions it could not be proven by preponderance of the evidence that Derivium had *intent* to steal Plaintiffs' *actual* collateral. True there was some evidence prior to 2009 that Derivium stole others' collateral and may even have stolen most collateral, but *intent* is required for all definitions of theft. That specific intent to steal Plaintiffs' stocks could not have been proved without at least some evidence going to Cathcart's state of mind. Sufficient evidence to that effect did not exist until his 2009 admissions.

(emphasis in original; internal reference omitted). At trial, it was apparent that the plaintiffs did not have actual knowledge of the fraud in 2007, or even in 2009. Plaintiffs' counsel asked Mr. Rochlis, regarding the failure of Derivium to complete the transaction, "[w]hen did you find out that they hadn't done the hedge?" and Mr. Rochlis responded that "[y]ou and some other attorneys contacted me in late 2012, early 2013." As Mr. Ishii testified at trial, in response to the question, "[d]o you recall having any knowledge of any court decisions that have been entered or judgments entered in any of the litigation against Derivium prior to 2009 that - where the Court found that Derivium had committed fraud with respect to the 90 percent loan transaction?" Mr. Ishii responded: "I do not believe I ever - I ever heard those - those things, so no." In response to the follow-up question, "[s]o the first time you knew anything about it was either - was, what, late 2012?" Mr. Ishii testified: "Yes. I believe that it was."

Defendant argues that "[w]hile there is a question regarding which rule regarding year of discovery should apply in this case, it is clear that under any of the various rules of discovery enunciated by the courts, plaintiffs' [sic] could have discovered the fact that Mr. Cathcart falsely represented that Derivium would hedge their stocks, and did so with fraudulent intent, well before 2009." Specifically, defendant contends that

[t]he same facts that Mr. Cathcart stipulated to in 2009 had already been set forth in the Government's complaint in that action that was filed in 2007. United States v. Cathcart, 2007 WL 3219375, ¶ 49, 50, 74 (N.D. Cal. 2007). Therefore, plaintiffs could have discovered the facts indicating that Mr. Cathcart had fraudulently misrepresented that he would hedge their stocks no later than 2007.

As explained above, the court notes that the entire first joint stipulation of facts in the above captioned cases, as well as many additional joint stipulations in the second joint stipulation of facts submitted to this court stem from the admissions and stipulations by Charles Cathcart in United States of America v. Charles Cathcart, et al., N.D. Cal., Case No. C-07-4762 (filed Nov. 19, 2009).

---

(internal citations omitted). As discussed above, none of the plaintiffs sought a return of their stocks when the loan term ended.

The preamble to the first joint stipulation of facts filed in this court states: "The parties to the above-entitled action, having met and conferred, and upon determining that good cause exists, hereby stipulate to those facts that were stipulated by Charles Cathcart and the Department of Justice in *United States of America v. Charles Cathcart, et al* [sic]*, N.D. Cal.,* Case No: C-07-4762 PJH, document 398, filed 11/19/09." (emphasis in original). Rather than separately identify each joint stipulation for the above captioned cases, the parties' first joint stipulation states: "Charles Cathcart and the Department of Justice stipulated to the facts contained in paragraphs 1-23, 25, 49-88, 90-93, 95-139, 141, 147-152, 155-157, 165-179, 183-191, and 193-196 of the United States of America's Proposed Findings of Fact and Conclusions of Law, document 348, attached as Exhibit B."

The preamble to the second joint stipulation of facts filed in this court similarly states: "The parties to the above-entitled action, having met and conferred, and upon determining that good cause exists, hereby stipulate to those facts that were stipulated by Charles Cathcart and the Department of Justice in *United States of America v. Charles Cathcart, et al* [sic]*, N.D. Cal.,* Case No: C-07-4762 PJH, document 398, filed 11/19/09." (emphasis in original). The second joint stipulation of facts also indicate that "Charles Cathcart and the Department of Justice stipulated to the facts contained in paragraphs 1-23, 25, 49-88, 90-93, 95-139, 141, 147-152, 155-157, 165-179, 183-191, and 193-196 of the United States of America's Proposed Findings of Fact and Conclusions of Law, document 348." Unlike the previous version of the joint stipulation of facts, in the second joint stipulation of facts, the parties separately broke out each of the stipulations from the previous case and created stipulations for the above captioned cases. By way of example, the first two stipulations in the second joint stipulation of facts state:

> 1. Charles Cathcart ("Cathcart") served as the "controlling mind" and "prime-mover" of the 90% Loan scheme. [Findings of Fact ¶1]

> 2. Cathcart, a Ph.D. economist, developed the concept for the 90% stock loan program ("90% Stock Program") in 1997, and in the same year began promoting a variety of 90% Loan products through FSC First Security Capital (Texas), which he co-owned with several individuals, including Kenneth Calvert ("Calvert"), David Kekich ("Kekich"), Rob Rawlings ("Rawlings"), and Clifford Lloyd ("Lloyd"). [Findings of Fact ¶2][28]

The only unique stipulation in the above captioned cases is the final stipulation, number 132, which states: "Irene M. Rochlis (aka Warren) passed away on March 13, 2011. Jon A. Rochlis, her son, was appointed as the Executor of her Estate."

---

[28] The court notes that the stipulations in the above captioned cases, even though organized differently are identical to the United States of America's Proposed Findings of Fact and Conclusions of Law in <u>United States of America v. Charles Cathcart, et al.</u>, N.D. Cal., Case No: C-07-4762 PJH.

It is the admissions and stipulations by Charles Cathcart in <u>United States of America v. Charles Cathcart, et al.</u>, N.D. Cal., Case No: C-07-4762 (filed Nov. 19, 2009), and not the allegations in the 2007 complaint that the parties in the above captioned cases rely on in forming their own stipulations. As indicated above, the admissions and stipulations in the case of <u>United States of America v. Charles Cathcart, et al.</u> were filed on November 19, 2009. Moreover, plaintiffs argue that until the 2009 admissions by Charles Cathcart, referenced in the introduction to both joint stipulations, "it could not be proven by preponderance of the evidence that Derivium had *intent* to steal Plaintiffs' *actual* collateral. True there was some evidence prior to 2009 that Derivium stole others' collateral and may even have stolen most collateral, but *intent* is required for all definitions of theft." (emphasis in original). Plaintiffs further contend that it was "[t]hat specific intent to steal Plaintiffs' stocks could not have been proved without at least some evidence going to Cathcart's state of mind. Sufficient evidence to that effect did not exist until his 2009 admissions."

Additionally, defendant argues that the standard for discovery of a theft loss is:

A theft loss is discovered when the taxpayer has knowledge both of a loss, and that it was the result of a theft. <u>Webber v. Commissioner</u>, 1992 WL 335901 *4 (T. Ct. 1992). However, "discovery" does not require that there be a judicial determination that a theft occurred. Rather, discovery occurs "when a claimant learns of the facts giving rise to a cause of action, not when a claimant learns that those facts present a violation of law." <u>McCune v. U.S. Dept. of Justice</u>, 592 F. Appx. 267 [sic], 291 (5th Cir. 2014).

Plaintiffs assert, however, that "[d]efendant discusses at length the discovery rule *vis a vis* statutes of limitation for tort, RICO, Right to Financial Privacy Act, or securities fraud claims, but not tax theft loss." (emphasis in original). In a footnote to its post-trial brief:

Defendant acknowledges that <u>McCune</u>[29] and several of the other cases discussed in this part involve analysis of a "discovery rule" that relates to determination of when a cause of action arises for purposes of the statute of limitations for bringing suit against the alleged perpetrator of a fraud or theft. We believe, however, that the principles discussed in those cases apply at least by analogy to the circumstances of these cases.

Defendant, therefore, admits that cases cited by defendant in its post-trail brief for the "discovery rule" and the argument that discovery occurs "'when a claimant learns of the facts giving rise to a cause of action, not when a claimant learns that those facts present a violation of law,'" (quoting <u>McCune v. U.S. Dep't of Justice</u>, 592 F. App'x at 291), have

---

[29] The court notes that <u>McCune v. U.S. Department of Justice</u>, is an unpublished decision from the United States Court of Appeals for the Fifth Circuit. <u>See</u> <u>McCune v. U.S. Dep't of Justice</u>, 592 F. App'x 287 (5th Cir. 2014). In addition, <u>McCune</u> involves violations for the Right to Financial Privacy Act, and the corresponding three year statute of limitations, and not theft loss. <u>See</u> <u>id.</u> at 288.

not been applied to cases involving theft loss. Notably, the only theft loss case cited by the defendant is <u>Webber v. Commissioner</u>, albeit a Tax Court case,[30] and not a United States Court of Federal Claims case.

The <u>Webber</u> decision cited by defendant indicates that "it is the discovery of the <u>theft</u>, and not a mere claim to one of the other losses enumerated under section 165, that entitles petitioner to the theft loss deduction. 'Until knowledge of both theft and loss coexist, a theft loss deduction is untenable.'" <u>Webber v. Comm'r</u>, T.C.M. 1992-667, 1992 WL 335901, at *4 (Nov. 18, 1992) (quoting <u>Marine v. Comm'r</u>, 92 T.C. 958, 976 (1989), <u>aff'd</u>, 921 F.2d 280 (9th Cir. 1991) (emphasis in original). This is consistent with other Tax Court decisions. <u>See</u>, <u>e.g.</u>, <u>Bunch v. Comm'r</u>, T.C.M. 2014-177, 2014 WL 4251136, at *6; <u>Allen v. Comm'r</u>, 16 T.C. at 166.[31]

Defendant also cites to two decisions related to the Derivium fraud as at issue in the cases currently before this court that defendant argues prove the plaintiffs knew or should have known about the fraud prior to 2009, <u>Raifman v. Wells Fargo Advisors, LLC</u> and <u>Landow v. Wachovia Securities, LLC</u>. Defendant claims that regarding the decision in <u>Raifman</u>:

> <u>Raifman v. Wells Fargo Advisors, LLC</u>, 2014 WL 120134436 [sic] (N.D. Calif. 2014), was a securities fraud action brought by five Derivium investors against the successor to Wachovia, the broker that sold the stocks for Derivium. The basis for the suit was the contention that Derivium committed fraud and that Wachovia was complicit in that fraud. The District Court dismissed the case because it concluded that the Derivium investors could have discovered the fraudulent conduct of Mr. Cathcart by no later than 2006.

The court notes that <u>Raifman v. Wells Fargo Advisors, LLC</u>, Case No. C 11-02885 SBA, 2014 WL 12013436 (N.D. Calif. March 31, 2014), is an unreported decision from the United States District Court for the Northern District of California. The <u>Raifman</u> court

---

[30] Although many of decided cases involving the issue of theft loss in tax cases emanate from the United States Tax Court, Tax Court decisions are not binding on the United States Court of Federal Claims. <u>See</u> <u>Arbitrage Trading, LLC v. United States</u>, 108 Fed. Cl. 588, 602 n.23 (2013) (quoting <u>Hinck v. United States</u>, 446 F.3d 1307, 1314 (Fed. Cir. 2006), <u>aff'd</u>, 550 U.S. 501 (2007) (The court acknowledges, however, that "[a]lthough decisions of the Tax Court are not binding on this court, the Tax Court 'is a specialized court with expertise in tax matters.'")).

[31] As indicated above, the taxpayer is not required to demonstrate a conviction has occurred to be able to recover a tax theft loss, nor does a taxpayer have to wait until a criminal conviction to seek a refund. <u>See</u> <u>Vietzke v. Comm'r</u>, 37 T.C. at 510. As noted above, the United States Court of Appeals for the Federal Circuit has held that for theft losses under 26 U.S.C. § 165, the "appropriate burden is proof by a preponderance of the evidence." <u>See</u> <u>Krahmer v. United States</u>, 810 F.2d at 1147.

in its factual findings pointed out that "[i]n December 2004, Wachovia closed all of Derivium's brokerage accounts and ceased any further account activities. On September 1, 2005, Derivium filed for bankruptcy protection. In October 2005, Forbes published an article, titled 'Offshore Mystery,' which described Derivium's 90% Stock-Loan Program and reported that the program was referred to as a 'Ponzi scheme.'" Id. at *2 (internal references omitted). The plaintiffs in Raifman alleged that they were "fraudulently induced by Wachovia to enter into their respective Master Agreements and Wachovia Account Agreements between 2000 and 2004." Id. The Raifman court considered whether Virginia law or California law should apply for the negligence and fraud claims against Wachovia, but ultimately determined that "because Plaintiffs' claims are untimely under California and Virginia law, the Court will not decide the choice of law issue. As discussed below, even under California's more generous rules, Plaintiffs' claims are time-barred." Id. at *7.

In reaching that conclusion, although specific to the Raifin plaintiffs, the Raifman, the court discussed the facts of the Derivium theft, as follows:

> Based on Wachovia's involvement in the 90% Stock-Loan Program as alleged in the TAC [third amended complaint], the Court finds that the Raifmans had reason to suspect wrongdoing regarding the program in late 2006, and therefore had an affirmative obligation to discover the facts supporting their claims against Wachovia and to file a complaint within the applicable limitations period. By late 2006, sufficient indicia of fraud existed to place the Raifmans on inquiry notice that they had been harmed by the 90% Stock-Loan Program. Once the Raifmans' collateral for their first stock-loan was not returned, they had a reasonable basis to question the validity of the representations made by Derivium and Wachovia concerning the 90% Stock-Loan Program. At that time, they had reason to suspect at least one fraudulent act; namely, that the ValueClick stock they pledged as collateral for their first stock loan was immediately sold by Wachovia, not hedged, without their permission purportedly in violation of their Wachovia Account Agreement and their Master Agreement. See Brandon G. [v. Gray], 111 Cal. App. 4th [29,] 35 [(2003)] (A plaintiff is on inquiry notice of its fraud claims when he "learns, or at least is put on notice, that a representation [is] false."). When the Raifmans had a suspicion of wrongdoing in late 2006, they were required to conduct a reasonable investigation of all potential causes of their injury.

Raifman v. Wells Fargo Advisors, LLC, 2014 WL 12013436, at *9 (footnotes omitted).

The Raifman court continued:

> The TAC does not allege specific facts showing that, despite diligent investigation of the circumstances of their injury, the Raifmans could not have reasonably discovered facts supporting their claims against Wachovia within the applicable limitations periods. While the TAC alleges that the Raifmans could not have learned of Wachovia's wrongdoing in connection with the 90% Stock-Loan Program until Plaintiffs' counsel discovered the

> Cathcart Letter in late 2010, it is silent regarding the Raifmans' investigation into the causes of their injury. Plaintiffs provide no explanation for why the TAC omits the facts discussed above regarding the Raifmans' investigation into the 90% Stock-Loan Program in late 2006.

Id. (footnote omitted).The Raifman court concluded that the plaintiff's claims against Wachovia were time-barred. See id. at *13.

Defendant in the cases currently before the court, further cites to a 2013 decision issued by the United States District Court for the Eastern District of New York also involving the Derivium fraud. Defendant states in its post-trial brief:

> Landow v. Wachovia Securities, LLC, 966 F. Supp. 2d 106 (E.D. N.Y. 2013), was another securities fraud action brought against Wachovia, based on the same allegations of fraud at issue in Raifman. After setting forth an extensive listing of the numerous fraud actions instituted against Mr. Cathcart between 2003 and 2007, the District Court concluded that Mr. Landow could have discovered the facts establishing that Mr. Cathcart committed fraud by no later than 2007. 966 F.Sujpp.2d [sic] at 120-23, 128. It is clear that plaintiffs could have discovered the fraudulent conduct of Mr. Cathcart prior to 2009.

In Landow v. Wachovia Securities, LLC, 966 F. Supp. 2d 106, which case is also specific to the Landow plaintiff in the same way as the Raifman case was, but which also included a discussion of the Derivium history, the defendant indicated, the court identified a series of events and dates for the Derivium fraud including:

> (1) On April 9, 2003, a borrower under the 90% Loan Program commenced an action against, inter alia, Derivium and Wachovia in the United States District Court for the District of Connecticut, asserting, inter alia, a claim for breach of fiduciary duty against Wachovia. McCarty v. Derivium Capital, LLC, No. 3:03 CV 00651 MRK (D. Conn.).

> (2) In 2004, General Holding Inc. ("General Holding") commenced an action against, inter alia, Bancroft, the Derivium owners, Derivium, Veridia and Optech in the United States District Court for the District of California, Sacramento Division, asserting claims, inter alia, for fraud, conversion and violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(a). General Holding Inc. v. Cathcart, No. 2:04–2749–DFL–DAD (D. Calif.).

> (3) On May 3, 2005, Newton Family LLC ("Newton Family") commenced an action against, inter alia, Derivium, Bancroft, the Derivium owners and Veridia, asserting claims, inter alia, for fraud, constructive fraud, RICO violations, conversion and federal securities fraud. Newton Family LLC v. Cathcart, No. 2:07–cv–2964–DCN (D.S.C.).

(4) In September 2005, Derivium filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. In re Derivium Capital, LLC, No. 05–37491 (Bankr. S.D.N.Y.).

(5) On October 17, 2005, Forbes.Com published an article about Derivium's 90% Loan Program, referring to it as "a very sophisticated Ponzi scheme;" indicating, inter alia, that "Derivium * * *, is in bankruptcy and under investigation by the Internal Revenue Service" and that Cathcart had said in a deposition the previous year that "he controlled the risk of a slide in the stock price by immediately selling the stock * * * [and] had no 'specific knowledge' of what hedges actually took place[;]" and referencing five (5) arbitrations and/or suits that had already been brought against Derivium by investors in the 90% Loan Program. Janet Novack, Offshore Mystery, (Oct. 17, 2005), at http://www.forbes.com/forbes/2005/1017/058_print.html. (Picon Decl., Ex. C).

(6) On November 3, 2005, WCN/GAN Partners Ltd. ("WCN/GAN") commenced an action against the Derivium owners and Bancroft asserting claims, inter alia, for fraud, constructive fraud, RICO violations, conversion and federal securities fraud. WCN/GAN Partners Ltd. v. Cathcart, No. 2:07–cv–2965–DCN (D.S.C.).

Landow v. Wachovia Sec., LLC, 966 F. Supp. 2d at 120-21 (emphasis, alterations, and omission in original). The Landow court issued 31 findings of fact, some of which are unrelated to the above captioned cases, but which included:

(20) On September 17, 2007, the United States commenced an action against, inter alia, Derivium, Veridia and the Derivium owners in the United States District Court for the Northern District of California to enjoin the promotion of the 90% Loan Program as a tax-fraud scheme ("the California Cathcart case"). United States v. Cathcart, No. C 07–04762 PJH (N.D. Calif.)[.]

(21) In October 2007, a published decision was entered in the bankruptcy proceeding. In re Derivium Capital, LLC, 380 B.R. 392 (Bankr. D.S.C. 2007) (denying Campbell's application for Sale of Property Free and Clear of Lien and Settlement of Claims in Connection Therewith).

(22) On December 21, 2007, borrowers under the 90% Loan Program commenced an action in the United States District Court for the Northern District of California challenging the IRS's treatment of a loan into which they entered under the 90% Loan Program in 2000 as a sale of stock. Schlachte v. United States, No. C 07–6446 PJH (N.D. Calif.)[.]

Landow v. Wachovia Sec., LLC, 966 F. Supp. 2d at 122-23.

The <u>Landow</u> plaintiff's causes of actions were against Wachovia, accusing Wachovia, among other things of agreeing "with Derivium to commit fraud against him and other borrowers under the 90% Loan Program," as well as accusing Wachovia of acting in concert with Derivium to knowingly draft false loan documents, Wachovia being aware Derivium was making false representations to Mr. Landow, and Wachovia breaching its fiduciary duty to Mr. Landow. <u>See</u> <u>id.</u> at 117-18. The <u>Landow</u> court applied New York law, as the <u>Landow</u> plaintiff was a New York State resident and noted that "New York law provides that an action based upon fraud, including claims of aiding and abetting and conspiracy to commit fraud, must be commenced within 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff * * * discovered the fraud, or could with reasonable diligence have discovered it.'" <u>Id.</u> at 126 (quoting N.Y. C.P.L.R. § 213(8)). The <u>Landow</u> court also determined, regarding Mr. Landow's claims for breach of fiduciary duty, that "[c]laims for breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, that are based upon fraud are subject to the same limitations period, i.e., six (6) years from the date the cause of action accrued or two (2) years from the time the plaintiff discovered, or could with reasonable diligence have discovered, the fraud." <u>Id.</u>

The <u>Landow</u> court stated that "[o]n or about April 9, 2003, plaintiff entered into six (6) loans with Derivium and Bancroft under the 90% Loan Program. The terms of those loans ranged from twenty-seven (27) to thirty-eight (38) years," and on "April 15, 2003, pursuant to plaintiff's instruction, Citibank transferred his FRNs portfolio to a brokerage account at Wachovia, which plaintiff had opened at Derivium's instruction." <u>Id.</u> at 114 (internal references omitted). The <u>Landow</u> court noted:

> On April 21, 2003, plaintiff executed certain documents authorizing Wachovia to transfer each of his FRNs from his Wachovia brokerage account to a certain account maintained by Bancroft at Wachovia," and according to the <u>Landow</u> plaintiff, the authorization to transfer his FRNs into Bancroft's Wachovia account did not authorize Wachovia to sell those securities, but Wachovia, nonetheless, sold them immediately upon their receipt without informing him, then transferred ninety percent (90%) of the proceeds from the sale to fund his loans and "pocketed" the remaining ten percent (10%).

<u>Id.</u> at 115 (internal references omitted). The <u>Landow</u> court determined,

> it is undisputed that those claims accrued no later than April 21, 2003, when the transfer occurred. Since this action was not commenced until June 29, 2012, more than nine (9) years after the fraud occurred, plaintiff's fraud-based claims, including his fraud-based breach of fiduciary duty and aiding and abetting breach of fiduciary claims, are timely only if they were commenced within two (2) years of the date plaintiff discovered the fraud, or could have discovered the fraud in the exercise of reasonable diligence.

<u>Id.</u> at 126-27. The <u>Landow</u> court reasoned:

The question, thus, is whether plaintiff could reasonably have inferred any of defendants' fraud from the facts known to him, or that were publicly asserted and reasonably accessible upon diligent inquiry. Assuming the truth of plaintiff's allegation that Wachovia continued to send him quarterly account statements falsely representing to him that his FRNs [Floating Rate Notes] were still being held as collateral under the loans, such quarterly statements ended as of August 2005. Accordingly, defendants' purported concealment of the fraud ended as of August 2005, almost seven (7) years prior to the commencement of this action. Nonetheless, it cannot be ascertained based upon the pleadings and documents integral thereto, or upon the matters of which judicial notice may be taken, whether plaintiff was placed on inquiry notice of defendants' purported fraud as of August 2005, when the quarterly statements stopped.

However, it is clear that plaintiff had knowledge of at least one fraudulent act, i.e., that his FRNs had been sold, and, thus, were no longer being held as collateral, no later than July 2007, when he received notice from the IRS that he owed taxes, penalties and interest based upon the sale of those FRNs. It is the very sale of the FRNs immediately upon their transfer from plaintiff's Wachovia account to the Wachovia account held by Bancroft, purportedly prior to the commencement of the respective loan terms, upon which plaintiff premises most of his fraud-based claims against defendants. The sale of a borrower's collateral immediately upon the transfer of such collateral from the borrower's brokerage account at Wachovia to another Wachovia account, purportedly in direct contravention of the loan terms and the representations previously made to the borrower, would suggest the probability of fraud, and defendants' participation therein, to a reasonably intelligent borrower. Thus, plaintiff clearly had knowledge of facts from which the alleged fraud by defendants might reasonably be inferred as of 2007, prompting a duty to inquire under New York law.

Landow v. Wachovia Sec., LLC, 966 F. Supp. 2d at 128 (internal reference omitted).

Based on the above, the Landow court reasoned that the plaintiff "clearly had knowledge of facts" that fraud might have been committed. See id. The same facts are not present in the above captioned cases as the current plaintiffs may have been unaware of issues with the hedging, as they surrendered their stock when the loan was complete, and appear not to have received any notices from the IRS like those received by Mr. Landow. Mr. Rochlis testified at trial that he signed the various documents selecting the option "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation."[32] Mr. Ishii did the same, and as discussed, during the cross-examination at trial, defendant's counsel asked, "because the stock was worth a tiny fraction of what

---

[32] At trial, Mr. Rochlis also offered "I will point out that I didn't voluntarily surrender it, as you maintain, because they had already stolen it. I mean, you can't surrender something that someone stole under false pretenses."

the loan - the principal and interest due on the loan was, you elected to surrender your stock and walk away from the deal?" to which Mr. Ishii responded: "Yeah, I elected to - to surrender the collateral." In response to the question, "as a result of surrendering the collateral and walking away from the loan, you were not required to make any payment to Derivium at the end of the transaction," Mr. Ishii responded: "Correct."[33]

Unlike the plaintiffs in <u>Landow</u> and <u>Raifman</u>, the above captioned plaintiffs appear to have been unaware of any potential theft of their securities, given that they did not seek to have their securities returned to them at the end of the loan period. The plaintiffs' knowledge prior to 2009 was not established as it was for the other victims of the fraud for whom Derivium did not return their collateral or for victims for whom Derivium stopped providing financial statements. Those plaintiffs would have had clear knowledge of possible fraud. Jon A. Rochlis testified that "Derivium never told us that they had assigned, pledged, sold, or anything to the collateral. They gave us statements every quarter for the duration showing how many shares they were holding for us. In fact, those were adjusted for splits. They showed dividends." As reflected in the findings of fact, plaintiffs in the above captioned cases, chose to surrender their securities as they were worth less than the loan value. Plaintiffs never sought to recover their stocks, continued to receive statements, and, apparently, were unaware during the loan period that Derivium was perpetrating a fraud. As noted above, Mr. Rochlis, and likely his mother, Ms. Warren, based on Mr. Rochlis role as facilitating the transaction for his mother and advising her, appear not to have had actual knowledge of the fraud until 2009 at the earliest based on the record before the court. Plaintiffs' counsel asked Mr. Rochlis, regarding the failure of Derivium to complete the transaction, "[w]hen did you find out that they hadn't done the hedge?" and Mr. Rochlis responded that "[y]ou and some other attorneys contacted me in late 2012, early 2013." Similarly, Mr. Ishii testified at trial, in response to the question, "[d]o you recall having any knowledge of any court decisions that have been entered or judgments entered in any of the litigation against Derivium prior to 2009 that - where the Court found that Derivium had committed fraud with respect to the 90 percent loan transaction?" Mr. Ishii responded: I do not believe I ever - I ever heard those - those things, so no." Additionally, although the <u>Landow</u> and <u>Raifman</u> cases are based on the same Derivium fraud, the posture of those cases was different from the above captioned cases. The <u>Landow</u> and <u>Raifman</u> cases were fraud cases against Wachovia, and, as such, had different statute of limitations issues, not present in the above captioned cases. Indeed, plaintiffs argue that "this is not a statute of limitations issue and those principles do not apply. The issue here is not when a statute of limitations starts to run. Rather it is definition of word 'discovery' in the statute. I.R.C. § 165(e)."

As indicated above, the Treasury Regulations for theft loss provide that a plaintiff is not entitled to a theft loss deduction until the plaintiff cannot demonstrate with reasonable certainty if a possibility of recovery exists. <u>See</u> Treasury Regulation § 1.165–1(d)(3); <u>see also</u> <u>Adkins v. United States</u>, 113 Fed. Cl. at 807. Plaintiffs allege that there was no possibility of recovery for any alleged theft. Plaintiffs note that "[o]n September 1, 2005, Derivium Capital, LLC filed Chapter 7 in United States Bankruptcy Court, District of

---

[33] As noted above, Ms. Warren did not testify at trial, but the record reflects that she surrendered her stock, like Mr. Rochlis and Mr. Ishii.

South Carolina (Charleston), Bankruptcy Petition #: 05-1 5042," but that plaintiffs did not participate in the bankruptcy case. The plaintiffs also speculate that "[b]ased on the Trustees Final Report in Case No. #: 05-15042, Dkt 1003, filed on 12/27/2017, if they had participated they would not have received anything from the bankruptcy process." The defendant does not challenge that there was no prospect of recovery for the plaintiffs in the above captioned cases. Therefore, given the requirement established by the United States Court of Appeals for the Federal Circuit that plaintiffs must prove a theft loss by a preponderance of the evidence, see Krahmer v. United States, 810 F.2d at 1147, when combined with the Treasury Regulations requirement that a theft loss deduction requires the loss be knowable, and, that there was no reasonable prospect of recovery, on the part of the indiviuals claiming the loss, see 26 C.F.R. § 1.165–1(d)(2)(i), and, that in the above captioned cases, the fact that requisite intent was not established until Charles Cathcart's 2009 admissions, the court determines that plaintiffs may use 2009 as a date for a theft to have occurred, assuming a theft took place. See Jeppsen v. Comm'r, 128 F.3d at 1418; Adkins v. United States, 113 Fed. Cl. at 807.

The parties disagree as to what law should be applied to an alleged theft in the above captioned cases for a 2009 potential theft. The court notes that plaintiffs initially argue that the court should not apply state law at all, and argue that "[t]he meaning of theft cannot depend on the vagaries of state law."[34] For their argument that state law should not govern, plaintiffs cite to only a single United States Court of Federal Claims decision, Goeller v. United States, 109 Fed. Cl. 534. In Goeller, Judge Allegra took issue with the deference courts give to the approach taken by the United States Court of Appeals for the Fifth Circuit in the decision in Edwards v. Bromberg, cited above, which determined that

> [u]nder this line of decisions it has been long and well established that whether a loss from theft occurs within the purview of Section 23(e)(3) of the Internal Revenue Code of 1939 and the corresponding provisions of prior acts, depends upon the law of the jurisdiction where it was sustained and that the exact nature of the crime, whether larceny or embezzlement, of obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft.

Edwards v. Bromberg, 232 F.2d at 111. In Goeller, Judge Allegra wrote:

> Neither Edwards nor any of its progeny, however, explain why state law should control the definition of what is a "theft"-most opinions are satisfied to treat the sentence from Edwards quoted above as axiomatic. As such, none of them begin to explain why Congress would want state-by-state

---

[34] The court notes that although plaintiffs argue that "[t]he meaning of theft cannot depend on the vagaries of state law," in arguing that 2009 was the operative year, plaintiffs cite to Bunch v. Commissioner, which plainly states: "Whether a theft loss has been established depends upon the law of the State where the alleged theft occurred." Bunch v. Comm'r, 2014 WL 4251136, at *6.

variability in the treatment of theft losses for Federal income tax purposes, particularly via a provision in which all the other triggering events for deductible losses-fire, storm, shipwreck, or casualty-are defined not by state law, but by reference to their plain meanings.

While the court is hesitant to replow a field that has been so extensively cultivated, it is obliged to do so, as none of the precedents adopting state law are binding here. Try as it might, the court cannot resist concluding that the idea that section 165(c)(3) somehow incorporates state criminal law into what is otherwise a federal taxing statute is a *non sequitur*. On close examination, the contrary view—that state law is controlling—appears to be a shibboleth that, by constant repetition, has become embedded in the jurisprudence of section 165. And "as is generally true of legal fictions, there are hosts of problems with this often-reiterated, but little analyzed, proposition." See Barnes v. United States, 68 Fed. Cl. 492, 501 (2005).

Goeller v. United States, 109 Fed. Cl. at 540 (emphasis in original). Judge Allegra, therefore, looked to the common law definition of theft to achieve a uniform, workable definition of theft for the Tax Code, as well as to Federal law and how the Federal law views theft in other contexts. Judge Allegra also noted the definition of theft under the Model Penal Code and how Black's Law Dictionary defined the term. Judge Allegra noted:

The key word in the statute-"theft"-has a long-standing and well-accepted meaning. Familiar lexicons mark this path. Thus, Black's Law Dictionary defines that term as "[t]he fraudulent taking of corporeal personal property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking." Black's Law Dictionary 1647–48 (4th ed. 1951); see also Webster's New Int'l Dictionary 2618 (2d ed. 1948) (theft: "the felonious taking and removing of personal property, with intent to deprive the rightful owner of it"). At least by the time the 1954 Code was enacted, it also was well-accepted that the definition of "theft" includes a crime in which one "obtains possession of property by lawful means and thereafter appropriates the property to the taker's own use." Black's Law Dictionary 1648 (4th ed. 1951); see also Webster's New Int'l Dictionary 2618 (2d ed. 1948) (theft includes "misappropriation or wrongful use of personal property originally lawfully taken or received"). Definitions like these have formed the *ratio dicendi* in many cases. These definitions of "theft" are largely indistinguishable from that employed in the Model Penal Code, which defines a "theft" as occurring where a person "unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." Model Penal Code § 223.2(1); see also id. at § 223.3 (theft by deception). This is relevant because the Model Code's provisions have often been employed in determining the scope of an offense referenced in a Federal statute. See, e.g., Taylor v. United States, 495 U.S. 575, 580, 598

n.8, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990); Hernandez–Mancilla v. INS, 246 F.3d 1002, 1007 (7th Cir. 2001).

> These well-accepted definitions of "theft" make reference here to state law unnecessary. Indeed, in determining whether particular conduct amounts to "theft" under other Federal statutes, the Supreme Court has eschewed applying an individual state's laws in favor of embracing a more uniform, common-law definition.

Goeller v. United States, 109 Fed. Cl. at 542-43 (emphasis in original) (footnote omitted). Judge Allegra instead fashioned a definition for theft pursuant to 26 U.S.C. § 165(c) that meant

> the fraudulent taking of property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with the intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking. This term also includes one who obtains possession of property by lawful means and thereafter appropriates the property.

Goeller v. United States, 109 Fed. Cl. at 549-50 (citations omitted). Judge Allegra applied his analysis to determine that there were genuine issues of material fact and the issue of a theft loss under 26 U.S.C. § 165 could not be decided on summary judgment. See Goeller v. United States, 109 Fed. Cl. at 550.

Plaintiffs, citing to Judge Allegra's decision in Goeller, argue that "Rochlis and Warren were victims of theft under Goeller," and also that "[t]he Ishiis were victims of theft under Goeller." As noted above, and as highlighted by defendant in response to plaintiffs' argument, "it is well established that state law should be used to determine whether a theft occurred."[35] Neither the parties, nor the court has identified a case issued by the United States Supreme Court or the United States Court of Appeals for the Federal Circuit as to which state law to apply to a theft loss. The decision in Edwards v. Bromberg is supported by several decisions by other federal courts of appeals affirming cases which applied a test of looking to the state law where the theft occurred. See, e.g., Lombard Brothers, Inc. v. United States, 893 F.2d 520, 523 (2d Cir. 1990) ("For purposes of Section 165, 'theft' includes larceny, embezzlement, and robbery, see 26 C.F.R. § 1.165–8(d), as defined by the law of the state where the claimed loss occurred-in the instant matter, Connecticut. . . ."); Bellis v. Comm'r, 540 F.2d 448, 449 (9th Cir. 1976) ("It is fundamental that the law of the Jurisdiction where the loss is sustained determines whether a theft has occurred for purposes of Section 165(e)."); Howard v. United States, 497 F.2d 1270 (7th Cir. 1974) ("It is impossible under this record to make any finding based upon credible evidence that a theft occurred as defined by the Illinois statutes. . . ."). Likewise, a number

---

[35] Defendant also argues that even using the definition fashioned by Judge Allegra in Goeller, "there would be no theft because no property belonging to plaintiffs was taken and there was no specific intent to deprive plaintiffs of any property they owned."

of United States Tax Court decisions have looked to the state law where the theft took place for purposes of determining whether a theft loss deduction was appropriate because a theft occurred. See, e.g., De Fusco v. Comm'r, 38 T.C.M. at 922 ("The question whether a 'theft' occurred is, of course, determined by the law of the state where the loss was sustained."); see also Luman v. Comm'r, 79 T.C. 846, 860 (1982); Paine v. Comm'r, 63 T.C. at 740; Hope v. Comm'r, 55 T.C. 1020, 1033-34 (1971) (applying Pennsylvania law to determine whether a theft occurred for the purposes of a theft loss deduction) (citing Edwards v. Bromberg, 232 F.2d at 111), aff'd, 471 F.2d 738 (3d Cir.), cert. denied, 414 U.S. 824 (1973); Herrington v. Comm'r, No. 12204-04, 2011 WL 1235720, at *4 (T.C. Mar. 30, 2011) ("Generally, whether a theft loss has been sustained depends upon the law of the State where the loss was sustained."). Moreover, the IRS' Revenue Rulings have noted the state law test articulated in Edwards v. Bromberg. See Rev. Rul. 77-17, 1977-1 C.B. 44 (1977) (noting that the Fifth Circuit in Edwards v. Bromberg had "stated that whether a loss from theft occurred depends upon the law of the jurisdiction where it was sustained"). The court notes that the United States Court of Appeals for the Sixth Circuit in United States v. Elsass, 769 F.3d 390, in declining to apply the Goeller standard, noted that "at no point do defendants appear to have brought to the district court's attention any distinction between state-law and federal-common-law definitions of theft." Id. at 397.

In the above captioned cases, the plaintiffs merely cite to Judge Allegra's case and assert that state law should not apply. Despite Judge Allegra's attempt to break new ground in order to try and simplify and make more predictable the law by fashioning a uniform definition of theft to apply to the United States Tax Code[36] for situations such as the ones presented here, this court will follow the lead of the numerous United States Courts of Appeals and the United States Tax Court and will apply the relevant state law in determining if a theft has occurred.[37]

---

[36] The court recognizes Judge Allegra's concern that because different state law could apply to different plaintiffs, even based on the identical underlying facts of how a theft occurred, the outcome could be different for individual plaintiffs. Absent legislative direction or a precedential decision, the court is reluctant to adopt Judge Allegra's approach given the much more widespread existing consensus regarding the state law approach articulated in Edwards v. Bromberg. The court also notes that a number of interests in this court are defined by state law, including, for example, certain other property determinations also within this court's jurisdiction. As indicated by the United States Supreme Court: "[W]e are mindful of the basic axiom that '"[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."'" Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)))) (omission in original).

[37] The court notes that in addition to only citing to Judge Allegra's decision, the plaintiffs did not address why federal common law could apply in lieu of state law, or if the Model Penal Code might apply to their refund claims. Notably, the Model Penal Code at section 223.2 does not refer to location when defining a theft:

In the event that state law is found to apply, "[d]efendant submits that Massachusetts law controls the determination of whether Mr. Rochlis and Mr. Ishii sustained theft losses, and Connecticut controls the determination of whether Irene Rochlis sustained a theft loss." By contrast, plaintiffs argue "[i]f the Court does not follow Goeller, the Court should apply South Carolina law."[38] Plaintiffs argue that "[i]n this case, South Carolina has general jurisdiction over the criminal actions of both Cathcart and Derivium because Cathcart and Derivium reside in South Carolina and because the activities at issue in this case occurred in South Carolina." Plaintiffs argue:

> The jurisdiction of State Courts is "subject to review for compatibility with the Fourteenth Amendment's Due Process Clause. [sic] Goodyear Dunlop Tires Operations, S. A. [sic] v. Brown, 564 U.S. 915,918 (2011). A State Court has court [sic] jurisdiction when the "paradigm forum" is an "individual's domicile," or, for corporations, "an equivalent place, one in which the corporation is fairly regarded as at home." Id. at 924. In this case, South Carolina has general jurisdiction over the criminal actions of both Cathcart and Derivium because Cathcart and Derivium reside in South Carolina and because the activities at issue in this case occurred in South Carolina.

The court notes that in their supplemental post-trial briefs plaintiffs are more careful about which law to apply, stating: "The issue of what state law applies is not simple. Plaintiffs believe that several state laws could apply and that, if a preponderance of the evidence shows that a theft occurred under any of the state laws, they should be entitled to a theft-loss deduction." Plaintiffs also concede that "Massachusetts and Connecticut law apply because the losses were sustained in those states," and indicate that "[c]ourts have held that theft-loss claims are governed by the laws of the state where the loss was 'sustained.'" Plaintiffs further state "[i]f that is the rule, then Plaintiffs believe that their resident state is most likely were [sic] their losses were sustained: Massachusetts for Mr.

---

(1) **Movable Property.** A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof.

(2) **Immovable Property.** A person is guilty of theft if he unlawfully transfers immovable property of another or any interest therein with purpose to benefit himself or another not entitled thereto.

Model Penal Code § 223.2 (2019) (emphasis in original).

[38] The plaintiffs' briefs also state: "Alternatively, Rochlis and Warren, were also victims of theft under Massachusetts law," and "the Ishiis, were also victims of theft under Massachusetts law." The plaintiffs' briefs further state: "Alternatively, Irene Warren was a victim of theft under Connecticut law," because "Irene Warren was a resident of Connecticut when the theft occurred."

Rochlis and Mr. Ishii, Connecticut for Mrs. Warren." (footnote omitted). As noted above, the court applies the relevant state law in determining if a theft has occurred. <u>See</u> <u>Lombard Brothers, Inc. v. United States</u>, 893 F.2d at 523; <u>Bellis v. Comm'r</u>, 540 F.2d 448; <u>Howard v. United States</u>, 497 F.2d 1270; <u>Edwards v. Bromberg</u>, 232 F.2d at 111. The court will apply Massachusetts law for the claims of the Rochlises and Ishiis, as they resided in Massachusetts when the Derivium transactions were entered into, and therefore, the alleged theft of the value of their stock took place,[39] and Connecticut law for Irene M. Warren for the same reasons. Kenneth Ishii resided in Massachusetts during 1999 and 2000 when his Derivium transactions took place. Jon A. Rochlis resided in Massachusetts during 2000 when his Derivium transactions took place. The definition of theft under Massachusetts state law is:

> Whoever steals, or with intent to defraud obtains by a false pretense, or whoever unlawfully, and with intent to steal or embezzle, converts, or secretes with intent to convert, the property of another as defined in this section, whether such property is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny. . . .

Mass. Gen. Laws 266 § 30(1) (1999).[40] Property, under Massachusetts state law, is defined for theft as

> The term "property," as used in this section, shall include money, personal chattels, a bank note, bond, promissory note, bill of exchange or other bill, order or certificate, a book of accounts for or concerning money or goods due or to become due or to be delivered, a deed or writing containing a conveyance of land, any valuable contract in force, a receipt, release or defeasance, a writ, process, certificate of title or duplicate certificate issued under chapter one hundred and eighty-five, a public record, anything which is of the realty or is annexed thereto, a security deposit received pursuant to section fifteen B of chapter one hundred and eighty-six, electronically processed or stored data, either tangible or intangible, data while in transit, telecommunications services, and any domesticated animal, including dogs, or a beast or bird which is ordinarily kept in confinement.

Mass. Gen. Laws 266 § 30(2) (1999).

In order to obtain a conviction for larceny in Massachusetts, Massachusetts General Laws 266 § 30 provides that the Commonwealth of Massachusetts must "prove beyond a reasonable doubt an unlawful taking and carrying away of the property of

---

[39] The court notes that Irene M. Warren resided in Connecticut at the time her Derivium transaction was executed and the alleged theft of the value of her stock occurred, and, therefore, the court applies Connecticut law to the theft allegations regarding Irene M. Warren, which is addressed below.

[40] The court notes that the Massachusetts General Laws for theft for 1999 and 2000 are identical.

another with the specific intent to deprive the person of the property permanently." Commonwealth v. St. Hilaire, 470 Mass. 338 (2015) (footnote omitted); see also Commonwealth v. Liebenow, 470 Mass. 151, 156 (2014); Commonwealth v. Bonilla, 47 N.E.3d 454, 456 (Mass. App. 2016) (quoting Commonwealth v. Murray, 401 Mass. 771, 772 (1988) ("In order to sustain a conviction for larceny, the Commonwealth must prove 'that a defendant took the personal property of another without the right to do so, and 'with the specific intent to deprive the other of the property permanently.'"). "To convict a defendant of larceny requires that the Commonwealth prove that a defendant took the personal property of another without the right to do so, and 'with the specific intent to deprive the other of the property permanently.'" Commonwealth v. Liebenow, 470 Mass. at 156 (quoting Commonwealth v. Murray, 401 Mass. 771, 772 (1988)). A Massachusetts appellate court explained:

> In Massachusetts, consistent with ancient common law principles, the fraudulent inducement of services is not larceny. See Commonwealth v. Rivers, 31 Mass. App. Ct. 669, 671 & n. 3, 583 N.E.2d 867 (1991) ("theft of services . . . [is] not . . . considered a criminal offense in the absence of special legislation"). Rather, in order to be convicted for larceny, some tangible res must be converted. This is reflected in G.L. c. 266, § 30, the general larceny statute, which criminalizes the conversion of "the property of another." "Property" is defined in § 30, as amended by St. 1995, c. 272, § 3, as: "money, personal chattels, a bank note, bond, promissory note, bill of exchange or other bill, order or certificate, a book of accounts . . . a deed . . . any valuable contract in force, a receipt, release or defeasance, a writ . . . a public record . . . a security deposit . . . electronically processed or stored data, either tangible or intangible, data while in transit, telecommunications services, and any domesticated animal, including dogs, or a beast or bird which is ordinarily kept in confinement."

> With the express exception of "data while in transit," "intangible" "electronically processed or stored data," and "telecommunications services," every item listed is some form of tangible property. The various types of construction services performed by all but three of the subcontractors here simply do not fall within the purview of G.L. c. 266, § 30, or the common law definition of the offense.

Commonwealth v. Geane, 744 N.E.2d 665, 670 (Mass. App. 2001) (emphasis and alterations in original).

Under Massachusetts state law, "[t]he offense of larceny by false pretenses is committed when there is a false statement of fact known or believed by the defendant to be false made with the intent that the person to whom it is made should rely upon its truth, and such person does rely upon it as true and parts with personal property as a result of such reliance." Commonwealth v. Greenberg, 339 Mass. 557, 574-75 (1959); see also Commonwealth v. Green, 326 Mass. 344, 348 (1950).

Plaintiffs argue that the for the Massachusetts residents "Cathcart's Stipulation and [Jon A.] Rochlis's trial testimony provide the requisite proof of the elements of theft under Massachusetts Law," and "Cathcart's Stipulation and [Kenneth] Ishii's trial testimony provide the requisite proof of the elements of theft under Massachusetts Law." According to the plaintiffs, the property allegedly stolen "was 10% of the value of the security transferred to Derivium." Plaintiffs claim that Charles Cathcart

> admitted he fraudulently took property belonging to Rochlis and Warren [and the Ishiis] when he stipulated that he served as the "controlling mind" of the 90% Loan Scheme; that he knowingly and intentionally misrepresented (i) that customers would retain beneficial ownership of their stocks, (ii) Derivium would engage in a hedging strategy and (iii) that Derivium's customers would be protected through a proprietary hedging strategy; he had reason to know that no hedging took place because he had a PhD in Economics; and he appropriated 10% of the value of the securities transferred to Derivium to his own use.

Plaintiffs in the above captioned cases quote and cite to the stipulations of fact extensively to try and demonstrate the elements of theft under Massachusetts law, noting that "Charles Cathcart ('Cathcart') served as the 'controlling mind' and 'prime-mover' of the 90% Loan scheme." Plaintiffs continue to quote from the joint stipulations:

> The 90% Loan Program was marketed as a way for customers to: (a) obtain the benefit of cash in an amount equal to 90% of the value of their securities; (b) defer paying capital gains on the transaction; and (c) be protected against the risk that the securities would depreciate while at the same time preserving their ability to take advantage of any possible appreciation in the securities' value.

> Derivium's marketing materials emphasized the customer's ability to recover their securities at the end of the transaction term, stating that the customer would "retain beneficial ownership" of his securities, such that "if your equities increase in value, you keep all the upside," and "[b]ecause you still own your stocks, you retain all the potential for further gains." **These statements were false, since Derivium sold its customers' securities prior to the inception of the transaction.**

(emphasis added by plaintiffs). Plaintiffs, further quote from the joint stipulations, as follows:

> The marketing materials state that Cathcart is a "world-recognized expert in building and preserving wealth for clients through the application of sophisticated hedging strategies," whose "proprietary structures and models are the foundation of the products offered through Derivium Capital." Derivium's marketing materials also state that Derivium will engage in "hedging" transactions to protect the value of customers' securities. These statements were also false Derivium never engaged in

hedging transactions. Rather, it simply sold its customers securities, remitted an amount equal to 90% of the proceeds back to its customers, and **kept the remaining 10% for its own purposes, including paying operating expenses and fees to its owners.**

(emphasis added by plaintiffs). Additionally, plaintiffs quote the joint stipulations which state:

> Following the sale of a customer's securities, however, Derivium and the supposed lenders faced a countervailing risk, which was that stock values would rise. Because **customers' securities were immediately sold in every case,** if a customer elected under the MLA to recover his securities at the end of the transaction term, Derivium had to repurchase the securities on the open market to return those shares to the customer.
>
> In the event that prices for more than a few of the securities submitted as collateral increased substantially during the transaction term, Derivium faced an inherent risk of being unable to satisfy the obligations to customers. Despite this known risk, Derivium never engaged in hedging transactions.
>
> Cathcart, Scott, Debevc, and Derivium's sales staff informed customers prior to entering into the transaction that their securities would be "hedged" pursuant to Cathcart's proprietary hedging formula. **These statements were false.**

(emphasis added by plaintiffs).

> Moreover, according to the same joint stipulations:
>
> The 90% Loan Program generated approximately 3100 transactions, totaling more than $1 billion in sale proceeds, 90% of which was used to fund the purported loans to customers, leaving at least $100 million as the difference between the purported loan proceeds and the value of the securities (the "Net Proceeds").
>
> Derivium used the Net Proceeds for a variety of purposes. Derivium (and later Derivium Capital USA and Veridia) kept approximately 20 to 25% of the Net Proceeds for itself in the form of commissions. Throughout its operation, Derivium's only significant source of income was commissions from the sale of customer's securities.
>
> Cathcart and Debevc and other employees of Derivium had signature authority over all domestic bank and brokerage accounts used in connection with the 90% Loan Program, and Debevc personally effected transfers from these various accounts into the Start-Up companies at Cathcart's recommendation or direction.

Cathcart identified and recommended investing in the Start-Up Companies. The purported "hedging" model implemented by Cathcart involved the immediate sale of the customer's securities and investment of the Net Proceeds into Start-Up companies owned and controlled by the Principals.

With regards to call options plaintiffs also cite to the joint stipulations entered into by the parties in the above captioned cases which indicate:

Cathcart says that call options were not purchased in connection with the 90% Loan Program because it would have been too expensive to do so. To adequately and truly hedge Derivium's risks related to the 90% Loan Program, Derivium would have had to purchase call options, correlated with its customers' securities. In fact, the Net Proceeds from the 90% Loan Program would have been insufficient to purchase adequate call options. Derivium did not maintain reserves of capital that could be drawn upon if the supposed "hedges" failed.

Plaintiffs quote from the same joint stipulations that:

Finally, the claim that the 90% Loan Program involved "hedging" is false or fraudulent. No funds were used to hedge any 90% Loan transactions. Cathcart's claim that the use of the 90% Loan proceeds (through "investment" in the "Start-Up Companies") constituted hedges against securities was pure fiction and constituted nothing more than an economic gamble.

Cathcart knew that the 90% Loan scheme operated by selling the customers' securities immediately upon receipt ("on behalf of" sham "lenders" Cathcart created), retaining 10% of the proceeds as income in Derivium-controlled bank and brokerage accounts, and then distributing the proceeds to Cathcart and his associates directly and to the Start-Up Companies (which Cathcart and his associates owned and managed). Cathcart also knew or had reason to know that no "hedging" took place and that the 90% Loan transactions were taxable sales. Cathcart is a Ph.D. economist who spent years working on actual derivatives and hedging instruments before creating the 90% Loan Program. He previously served as, among other things, President of Citicorp International Trading Company, Chief Economist of the Eastern Division of Citibank's US Treasury, Vice President of the Business Economics Group at W &R Grace, and an economist with Chase Manhattan Bank.

He knew or had reason to know that the diversion of 90% Loan proceeds into a variety of start-up construction companies in the same geographic region, owned by Cathcart and his cohorts (who lacked experience in the industry) was nothing more than an economic gamble, and any claim that these were "investments" constituted hedges against unrelated securities

was pure fiction. Based on the absence of actual hedging, Cathcart had reason to know Derivium would lack the funds to perform on (and thus would of default on) its obligation to return customers' securities upon demand at maturity.

Plaintiffs also rely on the trial testimony of Jon A. Rochlis and Kenneth Ishii to support their claims of theft losses. Plaintiffs cite to the trial testimony of Jon A. Rochlis that between 1990 and 1991, he purchased 225 shares of Cisco stock for approximately $10,000. At trial, he testified: "I invested about $10,000 in Cisco that became about $2 million - worth about $2 million about ten years later." He further testified, "I invested in a number of stocks. The ones relevant to this case include Network Appliance, Internet Security Systems, Amazon.com, Intel, Microsoft."

As described above, according to the testimony of Jon A. Rochlis, he first learned of Derivium Capital in "an advertisement in the Wall Street Journal for their 90 percent stock loan." Mr. Rochlis testified that "Randolph Anderson was the person who responded to me and was the sales/marketing person at Derivium" and that he "received brochures and emails from Mr. Anderson in January of 1999." Mr. Rochlis testified what he believed was the advantage of pursing the stock loan with Derivium,

> one of their attributes that they touted was that you own the stock. You still own your stock. You transfer it to them in escrow, and they hold it, but you still own it. Therefore, you - you benefit from - from - from an unlimited upside potential, which, of course, is marketing-speak, but you gain from the upside potential, again, minus the cost of the loan, but you have upside potential. It's designed that way.

Plaintiffs specifically cite to Jon A. Rochlis' testimony at trial that he would have not invested if not for Charles Cathcart's involvement, as he testified that "wouldn't have done it without the marketing brochures, particularly Charles Cathcart's experience in creating derivatives, because you couldn't just buy this off the shelf." In response to plaintiffs' counsel's question at trial: "So what were the advantages of the model proposed by Charles Cathcart?" Mr. Rochlis testified

> the advantages are you have got downside protection of 90 percent, you had upside potential if the stock rose above 120 percent of the value when you went into it, which, as you - as I have said, the stocks had certainly done - shown their ability to do that in the past. It was also somewhat less expensive than publicly traded options, and the term was for three years, and it was easy to do, where you didn't have three-year options, and so you had to keep rolling over the stock - the options, rather, when they expired every six months or something like that, which was a - would have been a lot of work and possibly more expensive as the stock prices would - would fluctuate.

Plaintiffs also cite to Jon A. Rochlis' trial testimony regarding the Derivium process, during which he stated: "So the Derivium hedge worked in that you gave them security for a loan

that was in the amount of 90 percent of the value when you transferred the securities, and they promised to deliver those securities to you in three years if you paid off the loan plus - plus interest." Regarding the arrangement with Derivium, Mr. Rochlis believed "[t]here was a term - there was a term of the agreement that said until they performed the hedge, we could demand our collateral back. Once they had done the hedge, we couldn't do it. Then we were locked into the three years."

Finally, plaintiffs cite to Jon A. Rochlis' reliance on Derivium to proceed with the hedges: Mr. Rochlis testified at trial that "Randolph Anderson represented to me that they would not sell the stock without hedging it. As a matter of fact, I think he said they would be crazy or insane. That's a conversation I remember pretty well for how long ago it was." Mr. Rochlis continued: "And similarly, I got comfortable with Derivium doing that because they were the derivatives and hedging gurus and experts, and they admitted that it would be crazy to sell the stock without putting a hedge in place."[41] In response to the question, "[w]hy did you file your theft loss claim in 2009?" Mr. Rochlis testified "because that was the first year, given the stipulations, that we could have known that there was actual - there was an actual mens rea, there was an actual intent, scienter on the part of Cathcart to steal - to fraudulently deprive us of our property." Mr. Rochlis further testified that "Derivium never told us that they had assigned, pledged, sold, or anything to the collateral. They gave us statements every quarter for the duration showing how many shares they were holding for us. In fact, those were adjusted for splits. They showed dividends. That reduced interest." Plaintiffs specifically noted Mr. Rochlis' statement that Derivium

> expressly promised to me that they would not sell my securities without a hedge, but they did, and so they robbed me of the upside potential of my stocks, and they did that the first day when they sold my shares in order to give me the 90 percent. They led me to believe that they would hold those shares or that they would hedge them. They didn't do that.

Additionally, plaintiffs point to the testimony of Kenneth Ishii, who testified at trial that he received stock options after he joined the company Accordance, which subsequently merged with Software.com and his Accordance options "got rolled over into new options in Software.com." At the time of his first transaction with Derivium, Mr. Ishii testified that the value of the Software.com stock "was probably on the order of 10 million [dollars] at that point." Mr. Ishii testified that "I also talked to Mr. Rochlis about, you know, what he had done and what my options there were, and it didn't really sound like, sort of on the public options market, there was any market for, you know, a brand new startup like Software.com, so that didn't really seem to be a possibility."

Regarding Derivium, Mr. Ishii explained, "I got standard marketing literature, and then eventually I - I don't remember how it was arranged, but I had a phone call with Randolph Anderson, and we talked about the different programs they had available and how - how they applied to my situation, and he described them, and - you know, and we

---

[41] Plaintiffs also point to Mr. Rochlis' testimony at the trial that he consulted an attorney, Daniel Byrnes, prior to entering into the Derivium transaction. Mr. Rochlis testified that Mr. Byrnes' opinion was the Derivium transactions were loans and not constructive sales.

moved forward from there." Mr. Ishii emphasized that Mr. Anderson explained, "the tax consequences of the event, and he said there were none. He also discussed how the 90 percent was an important number, because the 10 percent made it a significant risk, and so it wasn't deemed a sale by the IRS." Plaintiffs further point to Mr. Ishii's testimony of his understanding of the Derivium transaction. At trial, Mr. Ishii gave his view on how the Derivium hedge would work:

> My understanding was that they - they had someone - you know, they would get the money together, and I would give them the stock, and they would hedge however they were going to do, and whatever the value of that hedge was, I would get 90 percent of that value as a loan for the - for three years. And it was, you know, locked up for those three years, and it was nonrecourse, and that over that time, it would be 10 1/2 percent interest per year.

Mr. Ishii reiterated his belief that "I still continued to own the stock even though they held it, and, you know, so there was no sale. There was - and at the end of the loan period, I could pay back the loan, and I would get my stock back, and - and, you know, if it increased in value, I would - you know, I would have that gain."

Plaintiffs also focused on Mr. Ishii's understanding of his Master Loan Agreement, and the provision that provided that "[a]t any time the Client can request that any collateral not yet committed in an FSC hedging transaction be promptly returned resulting in the reduction of the amount and terms of the loan." Mr. Ishii testified that "I believe this - this meant that they had to be able to return the stock to me and up until the time it was hedged. So a hedge had to exist." Mr. Ishii testified that he entered into four total hedges with Derivium. For each one he testified that he "believed that they [Derivium] had hedged my stock, that they had entered into some contract protecting it." Finally, plaintiffs cite to Mr. Ishii's understanding of what Derivium took from him: "I believe they stole the upside on my stock, that they really - you know, by selling it with no guaranteed way of getting it back, at that point, it was - you know, if it had taken off, they were - I was - there was no way for them to get it back for me."

In sum, plaintiffs argue that "Cathcart's Stipulation and [Jon A.] Rochlis's trial testimony provide the requisite proof of the elements of theft under Massachusetts Law." Plaintiffs, consistent with the definitions above, argue: "The crime of larceny by false pretenses requires (1) a false statement of fact, (2) known or believed by defendant to be false, (3) accompanied with intent that person to whom it is made should rely upon its truth, and (4) where person to whom it is made does rely upon it as true, and (5) parts with personal property as result of such reliance." Plaintiffs argument boils down to: "The property stolen was 10% of the value of the security transferred to Derivium. Elements (1) and (2) above are proven by the by Cathcart's Stipulation[s]. Elements (3), (4), and (5) are proven by [Jon A.] Rochlis's trial testimony." (internal citations omitted).

Similarly, regarding the Ishiis' claims, plaintiffs argue that

> Cathcart's Stipulation and [Kenneth] Ishii's trial testimony provide the requisite proof of the elements of theft under Massachusetts Law. The property stolen was 10% of the value of the security transferred to Derivium. Elements (1) and (2) above are proven by the by Cathcart's Stipulation[s]. Elements (3), (4), and (5) are proven by the Ishiis's trial testimony. In summary, the Ishiis have satisfied their burden of proof under Mass. Gen. Laws Ch. 266, § 30(1).

(internal citations omitted).

The court believes plaintiffs' approach to try to link the joint stipulations and statements in the trial transcript to the standard for theft in Massachusetts is too underdeveloped. The plaintiffs, defendant, and the court, all agree that Derivium committed a fraud and engineered a scheme. The parties' stipulations, in addition to the ones quoted extensively above by the plaintiffs, state that "Cathcart knew or had reason to know that the 90% Loan Program's claims were false or fraudulent under Section 6700 [26 U.S.C § 6700]." Most pointily, the parties stipulate that: "As the scheme's founder, creator, and President, and as the alter ego of all of the sham 'foreign lenders,' Cathcart *knew* that several of the scheme's claims were false or fraudulent." (emphasis in original). Plaintiffs, however, fail to link the actions taken by Charles Cathcart and Derivium to the theft of any property owned by plaintiffs.

Defendant argues that

> [i]t is clear that there could have been no theft under Massachusetts law in this case because no tangible personal property belonging to plaintiffs was taken from them. 'Potential appreciation' in the value of stock that was never realized is not tangible personal property that can be the subject of theft under Massachusetts law. No portion of plaintiffs' stock could have been taken from them because they voluntarily surrendered all that stock to Derivium.

Defendant continues: "Regardless of whether Mr. Cathcart committed fraud when he knowingly misrepresented that Derivium would hedge the investors' stocks before selling them it is clear that conduct cannot constitute theft." The court also finds defendant's arguments on this issue too summary.

The court, however, ultimately agrees with defendant. On cross-examination, Mr. Rochlis testified that the only personal property that he owned that was transferred to Derivium was the stock and Mr. Ishii indicated the same. All plaintiffs also elected the option to surrender their securities to Derivium at the end of the three year old period. On the form from Derivium Maturing Loan Department, instead of selecting the option to repay the loan, or renew or refinance the loan, both Mr. Rochlis and Mr. Ishii selected the option: "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire

debt obligation."[42] The entirety of the stocks were relinquished to Derivium. The plaintiffs testified to the same at trial. Mr. Ishii testified "I elected to - to surrender the collateral." In response to the question, "as a result of surrendering the collateral and walking away from the loan, you were not required to make any payment to Derivium at the end of the transaction," Mr. Ishii responded: "Correct."[43] In addition to their testimony, the plaintiffs' tax returns likewise demonstrate the plaintiffs reported their stocks as sold after their voluntary surrender. For the 2002 and 2003 tax years plaintiffs reported the principal and interest due on the purported loans as the proceeds of the sale of their stocks.[44]

Even though the stocks were surrendered to Derivium, Mr. Ishii claimed that "I believe they stole the upside on my stock, that they really - you know, by selling it with no guaranteed way of getting it back, at that point, it was - you know, if it had taken off, they were - I was - there was no way for them to get it back for me," and Mr. Rochlis claimed

---

[42] As discussed below when addressing Irene M. Warren and Connecticut law, on the form from Derivium Maturing Loan Department, instead of selecting the option to repay the loan, or renew or refinance the loan, Irene M. Warren selected the option: "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation."

[43] Although conceding he signed the paperwork indicating "I/we officially surrender my/our collateral in satisfaction of my/our entire debt obligation," Mr. Rochlis contended at trial: "I will point out that I didn't voluntarily surrender it, as you maintain, because they had already stolen it. I mean, you can't surrender something that someone stole under false pretenses."

[44] The court notes that at trial, and in its post-trial briefs, defendant highlights that "plaintiffs claimed as deductions on their returns for 1999-2003 the interest that accrued on the purported Derivium loans, even though they did not pay that interest." In addition, defendant notes that "[a]s a result of those deductions, the amount they reported as the proceeds of the sales of their stocks was equal to the 90% cash they received. To reduce their tax related to that purported sale, plaintiffs subtracted from the sale proceeds their basis in those stocks. Plaintiffs' [sic] used 100% of their basis in their stocks to reduce their tax liability in 2002 and 2003." In response to defendant's counsel's question: "But by 2003, had all of the interest - Derivium-related interest which is reported on the account statements, had that all been deducted on your returns?" Jon A. Rochlis testified: "I would expect so. I would - I would have to actually verify it, go through them, but by the end of 2003, I would expect so." Similarly, Kenneth Ishii had the following exchange with defendant's counsel at trial:

[Q.] Did you pay any of the interest that accrued each year?

A. No. That would have been due at the end of the three years.

Q. Okay. But even though you didn't pay the interest, you deducted it each year on your returns as an investment interest expense?

A. I believe so.

that Derivium "expressly promised to me that they would not sell my securities without a hedge, but they did, and so they robbed me of the upside potential of my stocks, and they did that the first day when they sold my shares in order to give me the 90 percent." The court notes, however, that plaintiffs voluntarily surrendered the stock to Derivium at the end of the loan period. Furthermore, Jon A. Rochlis testified he would have surrendered his securities even if a hedge had occurred, because the value of the securities was worth less than the loan amount. Jon A. Rochlis had the following exchange with defendant's counsel on cross-examination:

> Q. - at the end of the transaction, you would have still surrendered the stock, correct -

> A. I would have still surrendered it, yes, if it was -

> Q. - whether it was hedged or not, because you still would have had to have paid more than that stock was worth in order to get it back.

> A. That's right. Yes, I would have done the same thing.

Moreover, although plaintiffs claim their 10% interest was taken from them, as defendant notes "[t]he 'hypothetical option' that plaintiffs claim was stolen from them cannot be the subject of a theft loss because one cannot steal something that never existed." The stipulations make clear that "Cathcart also knew or had reason to know that no 'hedging' took place." Plaintiffs likewise argue that "Derivium immediately sold their securities and did not hedge." As discussed below, it is also challenging to quantify the value of the "hypothetical option," because Derivium did not indicate how they would hedge plaintiffs' securities and, of course, did not enter into any kind of hedging arrangement or pursue a hedging strategy. The hypothetical nature of any potential loss also demonstrates the challenges that plaintiffs faced during the testimony at trial in articulating exactly what was taken from them as a result of the non existent hedge. The plaintiffs in their trial testimony and in their post-trial briefs were forced to speculate about what the hypothetical profit would be or what type of value they might have realized from the stock if Derivium had not immediately sold their securities and instead hedged the securities. Jon A. Rochlis testified it was the "upside potential of my stocks," and Kenneth Ishii testified that it was "the upside on my stock." Both plaintiffs could only comment on the speculative nature of there being an "upside" on the securities as opposed to something more tangible or a fixed dollar value that supposedly was taken from them.

Defendant also argues that "[e]ven if Derivium had properly hedged plaintiffs' stocks by purchasing a call option, that call option would belong to Derivium, not plaintiffs." Jon A. Rochlis' Master Loan Agreement provides at paragraph 3:

> The contemplated Loan(s) will be funded according to the terms identified in one or more terms sheets, which be labeled as Schedule A, individually numbered and signed by both parties, and, on signing, considered part of an [sic] merged into this Master Agreement. The Client understands that by transferring securities as collateral to DC and under the terms of the

53

Agreement, the Client gives DC and/or its assigns the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan. The Client agrees to assist the relevant entities in completing all requisite documents that may be necessary to accomplish such transfers.

Pursuant to the Master Loan Agreements, Derivium had the option to take the funds they were obligated to hedge and "short sell, and/or sell outright some or all of the securities during the period covered by the loan," with the plaintiffs' understanding that any benefits would accrue to Derivium during the loan period.[45] At trial, Jon A. Rochlis agreed with this conclusion during cross-examination:

[Q.] Now, if Derivium had done what they promised and let's say they purchased a call option on the day that they claimed that they hedged the transaction, that call option would have been the property of Derivium, correct?

A. Yes.

Q. And Derivium could have done - like you said you can buy the option, you can sell the option, you can do other things with it. Derivium would have been the one that would have done those things, not you, correct?

A. That's correct.

Q. Okay. So any hedge would have been, as far as the underlying financial instruments, would have all been owned by - whatever hedging transaction they entered into, whether it was an exotic derivative or it was a call option, that would all be the property of Derivium.

A. It would be.

In addition, paragraph 4 of Jon A. Rochlis' Master Loan Agreement states:

---

[45] Although the terms of the Master Loan Agreements do not explicitly state that Derivium would hedge the securities that plaintiffs transferred to Derivium, defendant concedes that it "is undisputed that principals of Derivium represented to investors that they would engage in hedging transactions with respect to the stock." As indicated above, the Master Loan Agreements provided that plaintiffs would provide to Derivium the right "to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan," and that Derivium, during the loan period "had the right to receive and retain the benefits from any such transactions."

DC agrees to return, at the end of the loan term, the same number of shares of the same securities received as collateral (as conditioned in the next sentence), as set out and defined in Schedule(s) A attached hereto, upon the Client satisfying in full all outstanding loan balances, including accrued interest. Said collateral shall reflect any and all stock splits, conversions, exchanges, mergers, or other distributions, except cash dividends credited toward interest due.

Schedule A, referred to in both Paragraph 3 and Paragraph 4 states that for the all the loans to Jon A. Rochlis, Irene M. Warren, and Kenneth Ishii that the term of the loan was "3 years" there was a "3 year lockout." Schedule A also provided that "[l]ender cannot call loan before maturity," and that the loan was "[n]on-recourse to borrower, recourse against the collateral only." Although the United States Court of Appeals for the Federal Circuit has not decided the issue, other United States Courts of Appeals faced with this issue have decided that "Derivium was treated as the owner of the stock for the duration of the loan."[46] Calloway v. Comm'r, 691 F.3d 1315, 1329 (11th Cir. 2012); see also Sollberger v. Comm'r, 691 F.3d 1119, 1125 (9th Cir. 2012). The Eleventh Circuit in Calloway, indicated that,

the terms of the Master Agreement and accompanying schedules also point to the conclusion that the transaction was a sale of Mr. Calloway's stock to Derivium. The Master Agreement granted Derivium the right to possess the stock, the equity in the stock, and the right to receive the profits from either holding or disposing of the stock. As well, the nonrecourse provision of the loan ensured that, once the transaction was entered, the risk of loss passed entirely to Derivium. Applying the benefits and burdens test, therefore, we believe that the transaction between Mr. Calloway and Derivium constituted a sale of securities.

Calloway v. Comm'r, 691 F.3d at 1330 (footnotes omitted).

In Sollberger v. Commissioner, 691 F.3d 1119,[47] the Ninth Circuit explained that

[o]n July 6, 2004, Sollberger entered into the Master Loan Financing and Security Agreement (the Master Agreement) with Optech. Under the Master Agreement, Optech agreed to loan Sollberger ninety percent of the face value of the FRNs [Floating Rate Notes] pursuant to the Schedule A–1 Loan Schedule (the Loan Schedule). In return, Sollberger agreed to transfer custody of the FRNs to Optech and give Optech certain rights. The loan was nonrecourse to Sollberger and secured only by the FRNs.

---

[46] The court further addresses the ownership of the securities below.

[47] The court notes that plaintiffs' counsel of record in the above captioned cases is also listed as the counsel of record for the taxpayer in Sollberger.

Id. at 1121 (footnote omitted). The <u>Sollberger</u> court explained that under the terms of the loan as follows:

> The loan term was seven years, and Sollberger was not allowed to prepay the principal before the maturity date. Optech agreed to return the FRNs to Sollberger at the end of the loan term if Sollberger had repaid the loan amount in full, in addition to any outstanding net interest, and late penalties due. However, Optech was given the right to sell or otherwise dispose of the FRNs during the loan term, without giving Sollberger notice, or receiving his consent.

Id. at 1122. The <u>Sollberger</u> court dismissed the <u>Sollberger</u> plaintiff's argument that the Master Loan Agreement entered into by the parties was not a sale:

> Sollberger further argues that the transaction was not a sale for tax purposes because he retained the right to have his collateral returned on demand since Optech had not fulfilled a condition precedent under the Master Agreement to fund a loan or implement a hedging strategy. This argument is based on Sollberger's misreading of the relevant agreements. The Master Agreement provided that "[e]ither party may terminate this Agreement at any time prior to the Lender's receipt of the Collateral and the initiation of any of the Lender's hedging transactions." The Loan Schedule, which set forth the final terms of the loan, provided that the seven-year loan term would "start[ ] from the date on which final Loan proceeds are delivered on the Loan transaction." Optech was entitled to hold and sell the FRNs during the loan term, and Sollberger had no right to demand the return of the FRNs during that time period. Here, Sollberger instructed his bank to transfer the FRNs to Optech on July 9, 2004, and Optech acknowledged receipt of the collateral on July 21, 2004. Optech then sold the FRNs on July 26, 2004 and delivered the loan proceeds to Sollberger on August 2, 2004. Sollberger did not attempt to void the agreement pursuant to the termination clause before Optech received and sold the FRNs. Although Optech may have breached the Master Agreement by selling the FRNs prior to the start of the loan term, as Sollberger contends, this breach does not transform the transaction into something other than a taxable sale of property. Accordingly, Sollberger's argument is unavailing.

Id. at 1126. The <u>Sollberger</u> court also cited to the Tax Court's decision in <u>Calloway v. Commissioner</u>, 135 T.C. 26, to note that

> Sollberger's arguments that the transaction was not a sale for tax purposes are easily addressed and discarded. Although Optech may have gotten the better end of the bargain because Sollberger received less than the full market value of the FRNs and still owes taxes on his gain, Sollberger received the benefit of his bargain. Perhaps like the taxpayer in <u>Calloway</u>, Sollberger engaged in the transaction because he believed he could receive ninety percent of his asset's value tax free. <u>See</u> <u>Calloway</u>, 135 T.C. at 38.

> If that was his belief, he was sorely mistaken, and the scheme only appears to be a theft in hindsight because it did not allow him to evade taxes. The fact that the sale of an asset, in the fullness of time, appears to have been a bad decision for a seller does not change the character of the transaction for tax purposes. Thus, we reject Sollberger's argument that the sale was not really a sale because Optech profited at his expense.

Sollberger v. Comm'r, 691 F.3d at 1125-26 (footnotes omitted). Based on the record before the court, the court agrees with defendant, and the decisions in Sollberger and Calloway, that Derivium, and not the plaintiffs were the owners of the securities after the Master Loan Agreements were entered into by Derivium and the plaintiffs.

Defendant also argues that "the evidence in the record of this case is not sufficient to meet plaintiffs' burden of proving that Mr. Cathcart had the specific intent to deprive plaintiffs of any property belonging to them at the time plaintiffs' stocks were transferred to Derivium." As noted above, in order to obtain a conviction for larceny Massachusetts General Laws 266 § 30, the Commonwealth must "prove beyond a reasonable doubt an unlawful taking and carrying away of the property of another with the specific intent to deprive the person of the property permanently." Commonwealth v. St. Hilaire, 470 Mass. 338 (emphasis added; footnote omitted); see also Commonwealth v. Liebenow, 470 Mass. at 156. Defendant contends that:

> While the record establishes that Mr. Cathcart falsely represented that Derivium would hedge plaintiffs' stocks before selling them, there is no evidence that at the time Derivium received plaintiffs' stocks Mr. Cathcart had no intention of complying with its obligation under paragraph 4[48] of the Agreement to return the same number of shares of the same stocks to plaintiffs at the end of the three-year lockout period upon their making the required payment.

In response, plaintiffs contend that "Cathcart intentionally made false statements about hedging knowing that Derivium would immediately sell Plaintiffs' collateral without hedging. Given his financial experience he knew that he could not meet his obligations under the contract. At a minimum his actions show an exceptional indifference to its ability

---

[48] As noted in the findings of fact, Jon A. Rochlis' Master Loan Agreement, at paragraph 4 states:

> DC agrees to return, at the end of the loan term, the same number of shares of the same securities received as collateral (as conditioned in the next sentence), as set out and defined in Schedule(s) A attached hereto, upon the Client satisfying in full all outstanding loan balances, including accrued interest. Said collateral shall reflect any and all stock splits, conversions, exchanges, mergers, or other distributions, except cash dividends credited toward interest due.

to return the collateral."[49] (internal citations omitted). Plaintiffs claim "[t]hat is sufficient proof under the preponderance of evidence standard. Therefore, Plaintiffs have submitted creditable evidence that Cathcart had the requisite intention and the burden. . . ." The court, however, finds the plaintiffs' arguments in this regard insufficient.

Defendant also questions whether anything of value of plaintiffs was taken by Derivium. As an initial matter, defendant argues that "[o]ne of the peculiar aspects of this case is the fact that plaintiffs actually benefitted economically from the Derivium transaction that they now contend constituted a theft. There cannot be a deductible theft loss if plaintiffs did not sustain any economic loss in the first place." Defendant notes that "[i]f plaintiffs had sold 100% of their stocks in 1999 or 2000, they would have had to pay tax on their substantial gain at that time, and they would have realized less than 80% of the value of their stocks," but the

> Derivium transaction allowed plaintiffs to realize 90% of the value of their stocks; to have the use of that money for a period of three years before having to pay any tax; and to deduct interest expense equal to about 33% of the loan amount, reducing their taxable income each year even though they never paid that interest.

Even if plaintiffs were able to connect the stipulations and testimony of Jon A. Rochlis and Kenneth Ishii to larceny by false pretense, it is unclear how the plaintiffs could prove something of value taken from them.

Furthermore, even if the plaintiffs were able to prove theft by false pretense or by embezzlement, the defendant points to an additional hurdle for plaintiffs. Citing to Washington Mutual, Inc. v. United States, defendant argues that even if a theft had occurred, plaintiffs have not demonstrated the amount of any potential theft. Plaintiffs respond that "[p]laintiffs were obviously damaged by Derivium's theft."[50] Much like plaintiffs broad statements discussed above, the court is not convinced by plaintiffs' damages claim. Plaintiffs argue, however, that the theft was "10% of the value of the collateral, but also three-years of possible appreciation, basically a call option (the right to buy a security at a specified price at a given time in the future). These are readily valued and have value when issued (the start of the loan) totally independent of their value at

---

[49] The court notes that plaintiffs did not introduce into evidence at the trial any document that demonstrated Charles Cathcart's state of mind, or that of anyone else associated with Derivium, during the plaintiffs' Derivium transactions. Plaintiffs only called Jon A. Rochlis, Kenneth Ishii and Mr. Wayne Fjeld, plaintiffs' expert, discussed below, during the three day trial. Plaintiffs appeared content to rely on the information in the joint stipulations to show Charles Cathcart's and Derivium's actions.

[50] As indicated above, a Judge of the United States Court of Federal Claims in Washington Mutual, Inc. v. United States stated that "plaintiffs bear the burden to prove, by a preponderance of the evidence, that they are entitled to the tax deductions at issue in this case and the correct amount of the tax refund due." Washington Mut., Inc. v. United States, 130 Fed. Cl. at 686-87 (citing United States v. Janis, 428 U.S. at 440).

the expiration (the end of their loan)." Defendant notes, however, that the "only evidence presented by plaintiffs as to the amount of the loss of any 'potential appreciation' in the value of their stock is the testimony of Mr. Fjeld. Mr. Fjeld only attempted to determine what a 'hypothetical' call option on plaintiffs' stocks would have cost." On cross-examination of Mr. Wayne Fjeld, plaintiffs' expert who was qualified at trial as "an expert in the area of valuation of call options," defendant's counsel asked:

> [Q.] But there were other types of transactions Derivium could have entered into in order to protect the upside of the stock other than a call option.
>
> A.  I believe so.
>
> Q. But you did not make any effort to quantify what the cost of those other types of hedging transactions were.
>
> A. I did not, and with honesty, some of those other strategies that I mentioned earlier, there is still some risk involved for Derivium, and what level of risk they're willing to undertake, I - I have no way of commenting on that.
>
> Q. Okay. And, in fact, just buying a straight call option without doing any of the other things, you know, such as selling "out of the money" options to reduce the cost, just the straight call option would be the most expensive way that Derivium could have hedged this transaction.
>
> A. Having not looked at other alternatives, I can't say with certainty, but if I had to wager - I suspect that buying the outright call option would be the most expensive way.

In addition to plaintiffs' expert not having analyzed other possible hedging options, Jon A. Rochlis and Kenneth Ishii testified that Derivium did not specifically indicate that Derivium would be choosing a call option for the hedge. Mr. Rochlis testified that "I don't recall whether they called it a call option. I - I don't care whether they called it - I wouldn't have cared whether they called it a call option. That's what it was." In response to the question: "Did Mr. Anderson ever tell you that Derivium was going to purchase call options or did he just refer to hedging transactions in general?" Mr. Rochlis testified: "He would have used the word 'hedge.' I don't recall him using the word 'call option.' He might have, but I don't think so." Mr. Ishii similarly testified in response to the question: "At any time, did anyone at Derivium - Mr. Anderson, Mr. Cathcart, Scott Cathcart or Charles Cathcart - ever tell you that Derivium was going to be purchasing a call option with respect to your stock?" Mr. Ishii testified: "They did not tell - talk about what kind of option, but they did describe their - their - the contract in terms of puts and calls." Kenneth Ishii then had the following exchange with defendant's counsel:

> Q. But they did, in fact - so all they really said was is they were going to enter into a hedging transaction?

A. Yes.

Q. And you didn't really know what the type of hedging transaction might be.

A. No.

Therefore, defendant argues that

> Derivium never promised to purchase call options to hedge plaintiffs' stock, plaintiffs have the burden to prove the cost of the other hedging transactions that Derivium could have used to protect the value of plaintiffs' stocks. The failure of plaintiffs to present any evidence as to the cost of those other hedging transactions precludes them from meeting their burden of proving the amount of any refund they would be entitled to under their theory.

Although the court agrees with the defendant that the failure by plaintiffs to present evidence of the cost of other possible hedging transactions demonstrates a failure of meeting their burden of proof, the court further finds the lack of plaintiffs' ability to quantify damages demonstrates that plaintiffs have failed to meet their burden of proof.

*State Law of Connecticut*

The court notes that Irene M. Warren resided in Connecticut when her Derivium transition took place.[51] The definition of larceny under Connecticut state law is, in relevant part:

> A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to:

---

[51] In its supplemental brief, plaintiff, claims that "Derivium also could have been tried in Massachusetts for Mrs. Warren's case because Derivium communicated with Mr. Rochlis in Massachusetts when he was acting as his mother's agent. Therefore, Derivium's communications with Mr. Rochlis about Mrs. Warren had affect [sic] in Massachusetts sufficient to confer criminal jurisdiction to Massachusetts for Mrs. Warren's transaction." The court, however, believes that Connecticut is the proper state law by which to evaluate Irene M. Warren's transactions and also notes that the only evidence plaintiffs cite for Jon A. Rochlis being his mother's agent is Ms. Rochlis' tax returns showing Mr. Rochlis as Mrs. Warren's third party designee authorized to communicate with the IRS. Plaintiffs claim that "[t]aken together such designations are evidence that Mr. Rochlis regularly acted as his mother's agent." The court finds, however, that this is insufficient evidence to find Jon A. Rochlis as an agent for the Derivium transaction.

(1) Embezzlement. A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody.

(2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person.

(3) Obtaining property by false promise. A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or does not believe that the third person intends to engage in such conduct. In any prosecution for larceny based upon a false promise, the defendant's intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed.

(4) Acquiring property lost, mislaid or delivered by mistake. A person who comes into control of property of another that he knows to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of larceny if, with purpose to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to it.

C.G.S.A. § 53a-119 (2000). The Connecticut General Statutes provide the definitions related to larceny to include:

"Property" means any money, personal property, real property, thing in action, evidence of debt or contract, or article of value of any kind. . . . (2) "Obtain" includes, but is not limited to, the bringing about of a transfer or purported transfer of property or of a legal interest therein, whether to the obtainer or another. (3) To "deprive" another of property means (A) to withhold it or cause it to be withheld from him permanently or for so extended a period or under such circumstances that the major portion of its economic value or benefit is lost to him, or (B) to dispose of the property in such manner or under such circumstances as to render it unlikely that an owner will recover such property. (4) To "appropriate" property of another to oneself or a third person means (A) to exercise control over it, or to aid a third person to exercise control over it, permanently or for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit, or (B) to dispose of the property for the benefit of oneself or a third person. (5) An "owner" means any person who has a right to possession superior to that of a taker, obtainer or withholder. . . .

C.G.S.A. § 53a-118 (2000). As explained by the Connecticut state courts:

"Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner. . . . Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. . . . Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency."

State v. Hayward, 169 Conn. App. 764, 772-73 (2016) (quoting State v. Flowers, 161 Conn. App. 747, 752 (2015), cert. denied, 320 Conn. 917, 131 A.3d 1154 (2016) (alternations in original). The court in State v. Hayward also indicated that "'[i]ntent may be inferred by the fact finder from the conduct of the defendant.'" Id. at 773 (quoting State v. Kimber, 48 Conn. App. 234, 240, cert. denied, 245 Conn. 902 (1998)). The Connecticut Supreme Court has indicated that "in order to sustain a conviction under Connecticut's larceny provisions, therefore, we require proof of the existence of a felonious intent to deprive the owner of the property permanently." State v. Calonico, 256 Conn. 135, 159 (2001).

Plaintiffs argue that for Irene M. Warren, "[i]n this case, the proof that Cathcart committed the crime of embezzlement under Conn. Gen. Stat. §. [sic] 53a-123a is the same as the proof required in the Goeller [v. United States, 109 Fed. Cl. 534] analysis. In summary, if the court applies the same analysis for determining whether a theft occurred in Goeller, above, [Irene M.] Warren will also have satisfied her burden of proof under Conn. Gen. Stat.§ 53a-123a." Plaintiffs do not cite to any specific cases or arguments unique to Connecticut, however, plaintiffs claim earlier in their briefs, unrelated to Connecticut law that

Derivium's many false representations of a proprietary hedging strategy to protect against downside risk induced Rochlis and Warren to without consent, part with their valuable securities. They did not provide consent because, while they expected Derivium to hold their securities or if sold to hedge, in fact Derivium immediately sold their securities and did not hedge. Rather it used the sale proceeds in excess of the 90% returned to Rochlis and Warren, for its own purposes. This meets the three-element definition from Goeller. . . .

(footnote omitted). As determined above, Goeller is not the standard that the court applies. Moreover, as with the Massachusetts analysis, the plaintiffs point to the stipulations of Charles Cathcart and the testimony of Jon A. Rochlis, but nothing specific to Irene M. Warren or Connecticut law. Although there was extremely little relevant testimony offered bearing on Irene M. Warren's claims, in reviewing the statutes, the court

agrees with the parties that the elements of larceny in Connecticut are substantially the same as in Massachusetts.[52] Defendant argues that;

> The reasons set forth above as to why the evidence in this case falls far short of meeting plaintiffs' burden of proving the crime of theft under Massachusetts law are fully applicable to the question of whether there was a theft in this case under Connecticut law. Since no property belonging to plaintiffs was even taken from them, and since Mr. Cathcart did not have the specific intent to deprive plaintiffs of their stocks when they were transferred to Derivium, the crime of theft cannot be established under either Massachusetts or Connecticut law.

In addition to the above discussion, the court notes an additional problem for Irene M. Warren's claims. As indicated above, the parties stipulate that "Irene M. Rochlis (aka Warren) passed away on March 13, 2011. Jon A. Rochlis, her son, was appointed as the Executor of her Estate." As Irene M. Warren had passed away in 2011, she was unavailable to testify at trial, and, therefore, unable to testify as to her intent when entering into the Derivium transaction. Although, "'[i]ntent may be inferred by the fact finder from the conduct of the defendant,'" State v. Hayward, 169 Conn. App. at 773 (quoting State v. Kimber, 48 Conn. App. at 240), the plaintiffs' approach to demonstrating the elements of theft were limited to citation to the joint stipulations and admissions of Charles Cathcart and the testimony of Jon A. Rochlis.

The only information regarding Irene M. Warren's involvement in the Derivium transaction are the documents she signed at the beginning and end of the transaction. She executed the Master Agreement with Derivium on June 9, 2000, transferring to Derivium 3,148 shares of Cisco Systems, Inc. stock in exchange for 90% of the value of the stock. That Master Agreement specifically provided that Irene M. Warren transfer right, title and interest in the stock Cisco Systems, Inc. to Derivium, which, in turn, had the right to sell or dispose of the stock. A week later, on June 16, 2000, Derivium sent Irene M. Warren a letter confirming that the proceeds of the Derivium transaction were transferred to her.[53]

The only other documents related to Irene M. Warren's Derivium transaction were the letter sent to Irene M. Warren regarding the end of the three year loan period, and her options under the Master Agreement to: (1) pay the principal and interest due on the loan

---

[52] In their supplemental brief, plaintiffs indicate "[m]ost of the applicable state laws on larceny are very similar, but there are a few differences." After review of the statutes the court finds no significant, relevant, substantive differences between Massachusetts and Connecticut law regarding the plaintiffs' larceny claims.

[53] Irene M. Warren also received a letter from Derivium on June 14, 2000, which reflected the value of her 3,148 shares of Cisco Systems, Inc. stock were worth $203,636.25, and that she would receive $183,272.63 as a loan from Derivium, or 90% of the value of the stock.

and obtain a return of Cisco Systems, Inc. stock, (2) renew or refinance the loan upon payment $9,137.07, or, (3) surrender the stock,[54] and Irene M. Warren's response, surrendering her Cisco Systems, Inc. stock to Derivium in which Irene M. Warren stated: "I/we hereby officially surrender my/our collateral in satisfaction of my/our entire debt obligation."

It is difficult to infer Irene M. Warren's intent from those three documents. Moreover, Irene M. Warren passed away on March 13, 2011, before she or Jon Rochlis learned about the Derivium fraud. At trial, plaintiffs' counsel asked Mr. Rochlis, regarding the failure of Derivium to complete the transaction, "[w]hen did you find out that they hadn't done the hedge?" and Mr. Rochlis responded that "[y]ou and some other attorneys contacted me in late 2012, early 2013." At trial, plaintiffs' counsel asked why Irene M. Warren was included on an email between Mr. Rochlis and Randolph Anderson, Mr. Rochlis' contact at Derivium, Mr. Rochlis testified that "[b]ecause my mother was also interested in a Derivium transaction and was - was considering that, and this is asking Derivium to work up whether they can do it for these stocks and the terms and the like for - for actually two different loan scenarios. She only actually entered into one later." Plaintiffs also allege, "Mrs. Warren relied upon her son, Mr. Rochlis for financial advice. This is shown by Mr. Rochlis's communication with Derivium on his mother's behalf and his preparation of her tax returns and designation as a third-party contact for the IRS." The court concludes that plaintiffs' examples of Irene M. Warren's intent, combined with the inadequacy of connecting the Connecticut statutes to the facts of Irene M. Warren's case are not sufficient to support her claim.

*Constructive Sale*

Plaintiffs argue that an alternative way to calculate the amount of a potential refund, would be that the court could treat the Derivium transactions as a "constructive sale of their securities for purposes of calculating their tax basis for the theft loss deduction." According to plaintiffs in their post-trial reply briefs, plaintiffs seek the following damages: "Jon Rochlis requests that he be allowed to deduct a theft loss on his 2009 tax return in the amount of either $229,165 (actual sale/exchange, cost as basis including recognized dividends) or $206,325 (constructive sale basis including recognized dividends)," "[t]he Estate of Irene Warren requests that Irene Warren be allowed to deduct a theft loss on her 2009 tax return in the amount of either $20,305 (actual sale/exchange, cost as basis) or $18,274 (constructive sale basis)," and "[t]he Ishiis request that they be allowed to deduct a theft loss on their 2009 tax return in the amount of $1,011,938 (actual sale/exchange, coast [sic] as basis) or $910,744 (constructive sale basis)." Plaintiffs, in their supplemental briefs, further argue that "[i]f the 90% loan transaction is treated as a sale to Rochlis, Warren, and Ishii of 90% of the fair market value of the stock transferred and purchase of a forward hedging contract in exchange for 10% of the fair market value of the stocks transferred to Derivium, then the cost basis should be 10% of the fair market value of the stocks transferred." (citation and footnote omitted). The court notes, therefore, that plaintiffs' specific valuations depend on the finding of a constructive sale.

---

[54] As noted above, the principal and interest due on the loan was $246,560.66, while the value of the 3,148 shares of Cisco Systems, Inc. stock in April 2003 was $54,563.97.

Section 1259 of the United States Tax Code describes a constructive sale:

(a) In general.--If there is a constructive sale of an appreciated financial position--

(1) the taxpayer shall recognize gain as if such position were sold, assigned, or otherwise terminated at its fair market value on the date of such constructive sale (and any gain shall be taken into account for the taxable year which included such date), and

(2) for purposes of applying this title for periods after the constructive sale-

(A) proper adjustment shall be made in the amount of any gain or loss subsequently realized with respect to such position for any gain taken into account by reason of paragraph (1), and

(B) the holding period of such position shall be determined as if such position were originally acquired on the date of such constructive sale.

26 U.S.C. § 1259 (2018). Subsection c of 26 U.S.C. § 1259 indicates:

(1) In general--A taxpayer shall be treated as having made a constructive sale of an appreciated financial position if the taxpayer (or a related person)-

(A) enters into a short sale of the same or substantially identical property,

(B) enters into an offsetting notional principal contract with respect to the same or substantially identical property,

(C) enters into a futures or forward contract to deliver the same or substantially identical property,

(D) in the case of an appreciated financial position that is a short sale or a contract described in subparagraph (B) or (C) with respect to any property, acquires the same or substantially identical property, or

(E) to the extent prescribed by the Secretary in regulations, enters into 1 or more other transactions (or acquires 1 or more positions) that have substantially the same effect as a transaction described in any of the preceding subparagraphs.

26 U.S.C. § 1259(c).

Defendant argues that "plaintiffs did not constructively sell their stock, but actually sold it when they entered into the transaction." As noted above, other courts have treated Derivium as the owner of the stock for the duration of the loan term. See Calloway v. Comm'r, 691 F.3d at 1329. The United States Court of Appeals for the Eleventh Circuit in Calloway v. Commissioner, provided a comprehensive and relevant analysis as to whether there was an actual sale to Derivium:

> The question presented here is whether Mr. Calloway's transaction with Derivium constituted a sale of property, the gain from which should have been included in his gross income for 2001. See 26 U.S.C. §§ 61(a)(3), 1001. When interpreting the Internal Revenue Code, "the term 'sale' is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money." Anschutz Co. v. Comm'r, 664 F.3d 313, 324 (10th Cir. 2011) (citing Comm'r v. Brown, 380 U.S. 563, 570–71, 85 S. Ct. 1162, 14 L. Ed. 2d 75 (1965)). To determine if a sale has occurred, we ask "whether, as a matter of historical fact, there has been a transfer of the benefits and burdens of ownership." Id. (citing Grodt & McKay Realty, 77 T.C. at 1237). Some of the factors that inform the benefits and burdens inquiry are:
>
> > (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.
>
> Grodt & McKay Realty, 77 T.C. at 1237–38 (internal citations omitted); see also Anschutz, 664 F.3d at 324–25. "[N]one of these factors is necessarily controlling; the incidence of ownership, rather, depends upon all the facts and circumstances." H.J. Heinz Co. & Subsidiaries v. United States, 76 Fed. Cl. 570, 582 (2007). Some factors may be more pertinent in some situations than others, and, indeed, some factors simply may be ill-suited or irrelevant to shed light on the ownership of assets under specific circumstances. See Sollberger v. Comm'r, No. 11–71883, 691 F.3d 1119, 1124–25, 2012 WL 3517865, at *4 (9th Cir. Aug. 16, 2012) ("[W]e agree that [the Grodt & McKay Realty] criteria may be relevant in a particular case, [but] we do not regard them as the only indicia of a sale that a court may consider. Creating an exclusive list of factors risks over-formalizing the concept of a 'sale,' hamstringing a court's effort to discern a transaction's substance and realities in evaluating tax consequences.").

In addition to the Grodt & McKay Realty test, the Tax Court also has identified a number of factors to help determine whether a taxpayer has

"transfer[red] the accoutrements of stock ownership." <u>Anschutz v. Comm'r</u>, 135 T.C. 78, 99 (2010), <u>aff'd</u>, 664 F.3d 313, 325 (10th Cir. 2011). They are:

> (1) [w]hether the person has legal title or a contractual right to obtain legal title in the future;
>
> (2) whether the person has the right to receive consideration from the transferee of the stock;
>
> (3) whether the person enjoys the economic benefits and burdens of being a shareholder;
>
> (4) whether the person has the power to control the company;
>
> (5) whether the person has the right to attend shareholder meetings;
>
> (6) whether the person has the ability to vote the shares;
>
> (7) whether the stock certificates are in the person's possession or are being
>
> held in escrow for the benefit of that person;
>
> (8) whether the corporation lists the person as a shareholder on its tax returns;
>
> (9) whether the person lists himself as a shareholder on his individual tax return;
>
> (10) whether the person has been compensated for the amount of income taxes due by reason of the person's shareholder status;
>
> (11) whether the person has access to the corporate books; and
>
> (12) whether the person shows by his overt acts that he believes he is the owner of the stock.

<u>Dunne v. Comm'r</u>, 95 T.C.M. (CCH) 1236, 1242 (2008), 2008 WL 656496, at *11 (T.C.2008) (internal citations omitted). As with the <u>Grodt & McKay Realty</u> factors, "[n]one of these factors alone is determinative," rather "their weight in each case depends on the surrounding facts and circumstances." <u>Dunne</u>, 95 T.C.M. (CCH) at 1242, 2008 WL 656496, at *11.

For obvious reasons, there is significant overlap between the Grodt & McKay Realty factors that help determine whether a sale of an asset has taken place, and the Dunne factors that help determine whether, for tax purposes, an individual owns stock. Compare, e.g., Grodt & McKay Realty, 77 T.C. at 1237 (listing first factor as "[w]hether legal title passes"), with Dunne, 95 T.C.M. (CCH) at 1242, 2008 WL 656496, at *11 (listing first factor as "[w]hether the person has legal title or a contractual right to obtain legal title in the future"). Indeed, the Dunne factors address the same question as the Grodt & McKay Realty factors—who has assumed the benefits and burdens of ownership—but tailor the terminology more precisely to the attributes of stocks and stock ownership. For instance, in Grodt & McKay Realty, the tax court identified "how the parties treat the transaction," or, slightly rephrased, whether the parties act as if a change in ownership has occurred, as a factor to consider. 77 T.C. at 1237. In Dunne, the court specified the ways in which a party may exercise his ownership rights in stock—whether the taxpayer has the ability to vote shares and whether the taxpayer shows by his overt acts that he believes he is the owner of the stock. See Dunne, 95 T.C.M. (CCH) at 1242, 2008 WL 656496, at *11.

Applying the Grodt & McKay Realty factors, as further refined by Dunne, to the present case, we believe that the most relevant of those factors point firmly to the conclusion that the 2001 transaction was a sale of stock for the purposes of Federal income tax. First among those considerations is the way that the parties treated the transaction in the foundational documents. Although denominated an agreement "To Provide Financing and Custodial Services," the terms of the Master Agreement make it clear that, during the period of time covered by the "loan," Derivium was the owner of the stock. We previously have observed that "the characteristics typically associated with 'stock' are that it grants 'the right to receive dividends contingent upon an apportionment of profits'; is negotiable; grants 'the ability to be pledged or hypothecated'; 'confer[s][ ] voting rights in proportion to the number of shares owned'; and has 'the capacity to appreciate in value.'" See Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1285 (11th Cir. 2007) (per curiam) (alteration in original) (quoting Landreth Timber Co. v. Landreth, 471 U.S. 681, 686, 105 S. Ct. 2297, 2302, 85 L. Ed. 2d 692 (1985)). When Mr. Calloway transferred his securities to Derivium pursuant to the Master Agreement, he ceded these rights of stock ownership to Derivium. Mr. Calloway gave Derivium "the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan." Furthermore, Derivium was entitled "to receive and retain the benefits from any such transactions," but "the Client [wa]s not entitled to these benefits during the term of [the] loan." Finally, for the duration of the agreement, Derivium had the right to vote Mr. Calloway's shares and to receive any dividends paid on those shares. Moreover, there was no opportunity for Mr. Calloway to pay the loan early and demand the return of his stock: Schedule A–1 contained

a "3 year lockout" that prohibited prepayment of the loan before maturity. According to the terms of the parties' agreement, therefore, Derivium was treated as the owner of the stock for the duration of the loan.

When evaluated according to other <u>Grodt & McKay Realty</u> factors, the terms of the Master Agreement and accompanying schedules also point to the conclusion that the transaction was a sale of Mr. Calloway's stock to Derivium. The Master Agreement granted Derivium the right to possess the stock, the equity in the stock, and the right to receive the profits from either holding or disposing of the stock. As well, the nonrecourse provision of the loan ensured that, once the transaction was entered, the risk of loss passed entirely to Derivium. Applying the benefits and burdens test, therefore, we believe that the transaction between Mr. Calloway and Derivium constituted a sale of securities.

<u>Calloway v. Comm'r</u>, 691 F.3d at 1327-30 (footnotes omitted; alternations in original).

This court agrees with the analysis by the <u>Calloway</u> court. As determined above, the court believes the plaintiffs transferred their interest in the stocks to Derivium. Consistent with language of the Master Loan Agreement in <u>Calloway</u>,[55] the Master Loan Agreements for the above captioned plaintiffs provide at paragraph 3:

The contemplated Loan(s) will be funded according to the terms identified in one or more term sheets, which be labeled as Schedule A, individually numbers and signed by both parties, and, on signing, considered part of an [sic] merged into this Master Agreement. The Client understands that by transferring securities as collateral to DC and under the terms of the Agreement, the Client gives DC and/or its assigns the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC and/or its assigns have the right to

---

[55] In <u>Calloway</u>, the Eleventh Circuit quoted paragraph 3 from the Master Loan Agreement at issue in the <u>Calloway</u> case:

The Client understands that by transferring securities as collateral to [Derivium] and under the terms of the Agreement, the Client gives [Derivium] and/or its assigns the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, *and/or sell outright some or all of the securities* during the period covered by the loan. The Client understands that [Derivium] and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan. . . .

<u>Calloway v. Comm'r</u>, 691 F.3d at 1318 (emphasis and alterations in original).

receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan. The Client agrees to assist the relevant entities in completing all requisite documents that may be necessary to accomplish such transfers.

Similarly, each of the Schedule A documents for the plaintiffs in the above captioned cases contained the same 3 year lockout period that the Calloway court identified as significant for ownership. Therefore, like the Calloway court, this court believes the risk was transferred from the plaintiffs "entirely to Derivium." Id. at 1330. The court notes this conclusion is consistent with the other Federal Courts decisions on the ownership of the stock for other Derivium transactions. See, e.g., Clark v. United States, 2012 WL 6709624, at *7 (N.D. Cal. 2012); Kurata v. Comm'r, T.C.M. 2011-64, 2011 WL 31939344, at *3 (2011); Shao v. Comm'r, T.C.M. 2010-189, 2010 WL 3377501, at *6 (2010).

Plaintiffs, however, point to the decision of Landow v. Commissioner, 12 T.C. 88, 2011 WL 3055224 (2011), to argue "the Tax Court held that the shares transferred to Derivium were to be taxed as being constructively sold at the date of transfer, instead of being taxed on the date of actual sale by Derivium." Plaintiffs cite to the following portion of the Tax Court decision in Landow:

We turn now to petitioners' argument that if we were to find, as we have, that the Derivium transaction at issue here constitutes a sale by Mr. Landow of the FRNs [floating rate notes], they would not be required under section 1042(e) to recognize any gain that Mr. Landow realized as a result of that sale. That is because, according to petitioners, gain under that section is recognized only where the taxpayer disposes of qualified replacement property (i.e., the FRN portfolio), and Mr. Landow did not dispose of the FRN portfolio; Derivium did.

Petitioners' argument misreads our Opinion in Calloway v. Commissioner, 135 T.C. 26, 2010 WL 2697300 (2010). In Calloway, an important fact was that Derivium sold the taxpayer's stock immediately after the taxpayer transferred it to Derivium. Id. at 34–36, 38–39. That fact, combined with other facts, led us to hold in Calloway that the taxpayer sold his stock when he transferred it to Derivium. Id. at 39. We did not hold in Calloway, as petitioners suggest, that Derivium's immediate sale of the taxpayer's stock constituted the sale with respect to which the taxpayer was subject to tax. Id. In making their argument under section 1042(e), petitioners are focusing on the wrong transaction, namely, Bancroft's immediate sale of the FRNs. The transaction on which we must focus to address petitioners' argument under section 1042(e) is Mr. Landow's disposition by sale of the FRNs to Bancroft.

On the record before us, we have found that Mr. Landow sold the FRN portfolio when he transferred that portfolio to Bancroft pursuant to the Derivium transaction documents. On that record, we further find that

petitioners are required under section 1042(e) to recognize for their taxable year 2003 any gain that Mr. Landow realized as a result of that sale.

Landow v. Comm'r, 2011 WL 3055224, at *18. The court disagrees with plaintiffs' interpretation of Landow that the Landow case concluded there was a constructive sale.[56] The Landow court never uses the phrase "constructive sale," nor does it cite to 26 U.S.C. § 1259. Moreover, the Landow court was considering a sale in the context of 26 U.S.C. § 1042(e), not 26 U.S.C. § 1259. The provision of the Tax Code at 26 U.S.C. § 1042 addresses "Sales of stock to employee stock ownership plans or certain cooperatives," and 26 U.S.C. § 1042(e), specifically deals with "Recapture of gain on disposition of qualified replacement property," neither of which are applicable to the above captioned cases.

In addition, the use of the Landow decision by plaintiffs in the context of a constructive sale undermines their argument for theft, as immediately after the portion of the opinion cited by plaintiffs, the Landow court determined:

> Petitioners also argue that if we were to find, as we have, that the Derivium transaction constitutes a sale by Mr. Landow of the FRNs, that sale would constitute a theft and therefore an involuntary conversion under section 1033(a). Consequently, according to petitioners, they are entitled to purchase replacement property as required by section 1033(a)(2)(A) and thereby defer under section 1033(a) any gain that Mr. Landow realized as a result of that sale.
>
> In Wheeler v. Commissioner, 58 T.C. 459, 1972 WL 2577 (1972), we explained the scope and the purpose of section 1033 as follows:
>
> > Congress clearly intended to extend the benefits of section 1033 * * * only to public takings and casualty-like conversions, and the limitation of its benefits to involuntary conversions-i.e., those "wholly beyond the control of the one whose property has been taken"-reflects that intent.
>
> Id. at 463 (quoting Dear Publ. & Radio, Inc. v. Commissioner, 274 F.2d 656, 660 (3d Cir.1960), affg. 31 T.C. 1168, 1959 WL 1281 (1959)).
>
> Mr. Landow voluntarily entered into the Derivium transaction in which he transferred to Bancroft the FRN portfolio in exchange for $13.5 million in cash and gave Bancroft the right, inter alia, to sell the FRN portfolio without notice to him and to retain the proceeds of that sale. On the record before us, we find that Mr. Landow's sale of the FRN portfolio to Bancroft in

---

[56] The court also notes one of the differences between Landow and the above captioned cases is that the securities transferred to Derivium were stocks by plaintiffs and the securities transferred by Landow were floating rate notes.

exchange for $13.5 million in cash does not constitute an involuntary conversion, as defined in section 1033. On that record, we further find that petitioners are not entitled to defer under that section any gain that Mr. Landow realized as a result of that sale.

Landow v. Comm'r, 2011 WL 3055224, at *18-19 (footnote omitted).

In addition to Calloway, as noted by defendant, in United States of v. Cathcart, the United States District Court for the Northern District of California issued an unpublished decision on an interim motion for summary judgment and concluded:

The government has established, through reliance on legal precedent and the undisputed evidence in the record, that the 90% loan transactions at issue constitute sales of securities for purposes of tax code treatment, as opposed to bona fide loans. The undisputed evidence reveals, among other facts: that, as part of the loan transaction in question, legal title of a customer's securities transfers to Derivium (for example) during the purported loan term in question, which vests possession of the shares in Derivium's hands for the duration of the purported loan term; that the customer must transfer 100% of all shares of securities to Derivium and that once transferred, Derivium sells those shares on the open market, and that once sold, Derivium transfers 90% of that sale amount to the customer as the "loan" amount, keeping 10% in Derivium's hands; that during the term of the loan, the Master Loan Agreement provides that Derivium has the right to receive all benefits that come from disposition of the customer's securities, and that the customer is not entitled to these benefits; that the customer is furthermore prohibited from repaying the loan amount prior to maturity and is not required to pay any interest before the loan maturity date; and that, at the end of the purported loan term, the customer is not required to repay the amount of the loan (but merely allowed to do so as one option at the loan's maturity date) and can exercise the option to walk away from the loan entirely at the maturity date without repaying the principle; and thus, can conceivably walk away from the transaction without paying interest at all on the loan.

United States of Am. v. Cathcart et. al, No. C 07–4762 PJH, 2009 WL 3103652, at *1 (N.D. Cal. Sept. 22, 2009).[57]

Plaintiffs respond notwithstanding the forgoing, that this court should treat the Derivium transaction as a constructive sale for a forward contract. The constructive sale

---

[57] As noted above that the stipulations in the above captioned cases, even though organized differently are identical to the United States of America's Proposed Findings of Fact and Conclusions of Law in United States of America v. Charles Cathcart, et al., N.D. Cal., Case No: C-07-4762 PJH.

provision of the Tax Code allows for "a futures or forward contract to deliver the same or substantially identical property." 26 U.S.C. § 1259(c)(1)(C). Plaintiffs contend that

> [i]n this case, the 90% stock loan was a constructive sale because the Plaintiffs entered into forward contracts with Derivium. The collateral stocks were appreciated financial positions because if sold there would be gain. The contracts were forward contracts because the Plaintiffs agreed to deliver a fixed number of shares in three years in exchange for a fixed price of 90% of their initial value. Derivium was to provide hedging services and was required to act as custodian of the collateral during that time.

(internal citations omitted). The court notes, however, that there was no contract that plaintiffs entered into for future results. Plaintiffs could repay the loan amount or surrender their interests, but they were not obligated to provide anything to Derivium under the terms of the loans. Additionally the court cannot find a constructive sale when the plaintiffs in the cases before this court all selected the option to surrender the stock to Derivium at the end of the loan period. Defendant also points out that because ownership had been transferred to Derivium at the beginning of the loan period, "the Agreement cannot be treated as a forward contract since plaintiffs were not obligated 'to deliver the same or substantially identical property' to Derivium at the end of the three years." (quoting 26 U.S.C. § 1259(c)(1)(c).

In addition, defendant stresses that 26 U.S.C. § 1259 "cannot apply because plaintiffs did not recognize any gain when they transferred their stocks, but rather treated the 90% payment as a nontaxable loan." Plaintiffs respond that

> [a]lthough Plaintiffs were not aware what had transpired, nor were they certain as to how the 90% loan should have been reported, they filed tax returns that self-reported their best estimate based on independent legal advice. At the end of the loan terms Rochlis, Warren, and Ishii reported capital gains tax on the cash received from Derivium, plus dividends reported on stocks that Derivium previously sold, plus three years of interested [sic] reported by Derivium which they had previously deducted based on financial reports issued by Derivium.

Although the court is sympathetic to plaintiffs' apparent reliance on counsel, and Derivium's false representations to plaintiffs, this does not change the facts, as indicated above, that plaintiffs reported on their 2002 and 2003 tax returns that their stocks had been sold when they surrendered the stocks to Derivium. In addition, to reporting having entered into sales, the plaintiffs also reported the principal and interest on the sale of the stocks in the same tax years. Therefore, the plaintiffs have not demonstrated that their Derivium transactions were constructive sales. For the foregoing reasons, the court finds that the plaintiffs have not met their burden under Massachusetts law and Connecticut law and 28 U.S.C. § 165 of a theft loss.

**CONCLUSION**

After a review of the record, the trial transcript, the submissions of the parties, and the applicable law, the court concludes that for the reasons discussed above, none of the plaintiffs qualify for a theft loss for their 2009 tax years. Therefore, plaintiffs are not entitled to a theft loss deduction under 26 U.S.C. § 165. Plaintiffs' complaints are **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**